1              FMCS ARBITRATION

2                  - - -

In the matter of an arbitration between:

3

UAW LOCAL 1186,                    )Case No.
4                                  )040921-08284-7
                                   )
5         and                      )Grievance No.
                                   )04-35-HP6
6   ACCURIDE AKW,                  )
                       - - -

7

                TRANSCRIPT OF PROCEEDINGS
8            Wednesday, January 26, 2005

9                  - - -

10       The above matter came on for hearing before
    ROBERT A. CREO, Impartial Arbitrator, at FMCS, 410
11  Cranberry Street, Suite 110, Erie, Pennsylvania
    16507, commencing at 8:45 o'clock a.m. on the day and
12  date above set forth.

13  APPEARANCES:

14       On behalf of the Company:

15           Ryley Carlock & Applewhite:
             Frederick C. Miner, Esquire
16           One North Central Avenue, Suite 1200
             Phoenix, Arizona  85004-4417
17
         On behalf of the Union:
18
             Region 9, UAW:
19           Edward J. McGowan
             35 George Karl Boulevard, Suite 200
20           Amherst, New York  14221

21  ALSO PRESENT:

22       Douglas Ferguson, President Local 1186
         Gary Montroy, Vice President Local 1186
23       Ron Celeski, Recording Secretary
         Michael Pinson, Human Resources Manager
24       Pat Wolfe, Director of Compensation/Benefits
         Lance E. Hannaford, Court Reporter
25                 - - -

1    1998.

2        (Thereupon, Joint Exhibit Nos. 1 through 4

3    were marked for identification.)

4        THE ARBITRATOR:  With that I will turn to

5    the union for any type of opening statement or

6    remarks they want to make.

7        MR. McGOWAN:  The case before the

8    arbitrator involves, from the union's point, a

9    charge of a breach of the current collective

10   bargaining agreement.

11       It involves the company's refusal to

12   provide health insurance benefits and other

13   benefits to active employees pursuant -- union

14   argues pursuant to terms of the current

15   collective bargaining agreement.

16       The arbitrator will hear and the union will

17   present the factual history and collective

18   bargaining agreements leading up to the issue.

19       The previous collective bargaining

20   agreement contains specific and special terms for

21   a select group of employee -- active Accuride

22   employees, which excluded them from health

23   insurance coverage provided by Accuride.

24       The new collective bargaining agreement

25   specifically does not contain those terms.

1          Those terms were specifically excluded in

2     collective bargaining.

3          And the company subsequently refused to

4     honor the current terms of the collective

5     bargaining agreement by supplying health

6     insurance, when it was needed, to current

7     Accuride active employees.

8          The union will present a documentary trail

9     that establishes the issues and the basic facts.

10          The argument at issue for the arbitrator to

11     decide is going to be simply the terms of the

12     current collective bargaining agreement, the

13     parties' agreement and the documents itself,

14     which quite frankly speak for themselves.

15          And the union will argue that those

16     documents and the agreements provide for a

17     company obligation to provide medical insurance

18     to active, current active Accuride employees.

19          There is no exclusionary provisions in the

20     current contract.

21          There are no waivers in the current

22     contract.

23          As such, the union argues they are an

24     employee with the same rights and obligations

25     from the company pursuant to provision of health

1    insurance as any other employee.

2    THE ARBITRATOR:  What remedy do you seek?

3    MR. McGOWAN:  Basically, the union seeks

4    the reactivation of the health insurance from

5    the -- back from the date when the employees

6    became eligible.

7    And if that is not possible, the union

8    would request that the company or the arbitrator

9    award any costs, which the employees have

10   undergone, such as medical services, which the

11   insurance would have paid for, had they been

12   covered.

13   THE ARBITRATOR:  Okay.

14   Turn to the employer, if you want to make

15   an opening statement now.

16   MR. MINER:  I will reserve my opening

17   statement.

18   But with respect to my understanding of the

19   issue that Mr. McGowan just articulated, I would

20   agree that the issue is whether the company

21   violated the collective bargaining agreement with

22   respect to the grievance in the case.

23   THE ARBITRATOR:  Okay.

24   If there are things that are not really in

25   dispute, I don't need to have a lot of witness

1      A      I oversee the compensation and benefit

2   programs for Accuride Corporation.  I work with the

3   plant locations.

4      Q      What kind of business is Accuride in?

5      A      We manufacture truck and trailer aluminum

6   and steel parts.

7      Q      How many facilities does it currently

8   operate?

9      A      We operate four facilities.

10      Q      Are you familiar with the Erie facility?

11      A      Yes.  I am.

12      Q      How is that?

13      A      I was acting director of human resources in

14   1997.

15      Q      How long have you been director of

16   compensation and benefits?

17      A      Since 1997.

18      Q      In 1997 you had a stint as acting HR

19   manager at the Erie plant?

20      A      Yes.  I did.

21      Q      How long were you at the Erie plant in that

22   role?

23      A      Approximately six months.

24      Q      How long has Accuride had an interest in

25   the Erie plant?

1    A    We joined -- formed a joint venture with
2 Kaiser effective May 1 of 1997.

3    Q    Do you know how long the Erie plant has
4 been in operation?

5    A    The Erie plant has been in operation since
6 1954.

7    Q    Prior to 1997, who operated the Erie plant?

8    A    It was Kaiser.

9    Q    What is Kaiser?

10    A    They are in the aluminum business.

11    Q    When did the joint venture come about?

12    A    It was effective May 1, 1997.

13    Q    Thank you.

14        Was there a name attached to the joint
15 venture?

16    A    Yes.

17        It was called AKW, LP.

18    Q    I will refer to it as AKW.  What kind of
19 entity is AKW?

20    A    It is a limited partnership.

21    Q    And in May of 1997, who were the parties
22 who had interests in AKW?

23    A    Accuride Corporation and Kaiser.

24    Q    Were they both partners in the limited
25 partnership?

1    A    Yes.  They were.

2    Q    Is that still true today?

3    A    No.

4    Q    How many parties have interests in AKW

5    today?

6    A    Just one.  Accuride Corporation.

7    Q    When did Accuride come to acquire all of

8    the interest in AKW?

9    A    Kaiser sold its portion to Accuride in 1999.

10    Q    Has there been a name change of the entity?

11    A    It is now called Accuride Erie, LP.

12    Q    And that continues to be a limited

13    partnership?

14    A    Yes.  It is.

15    Q    Has there been any interruption in the

16    limited partnership's existence since it came in to

17    existence in May of 1997?

18    A    No.

19    Q    While you were the acting HR manager at the

20    Erie plant, were you involved in hiring work force?

21    A    Yes.  I was.

22    Q    I will start by asking for this to be

23    marked as Company Exhibit 1.

24        (Thereupon, Company Exhibit No. 1 was

25        marked for identification.)

1     Q     I will ask you to take a look at that.

2           And after you have reviewed it, please

3  identify it for the arbitrator.

4     A     Okay.

5     Q     What is this document?

6     A     It is an internal memorandum that was

7  distributed to all Kaiser UAW hourly employees

8  regarding the application process to become an AKW

9  employee.

10    Q     Did you participate in preparing this

11 document?

12    A     Yes.  I did.

13    Q     Is that your signature on page 3 of the

14 document?

15    A     Yes.  It is.

16    Q     Give us a summary, from a 10,000 foot

17 level, how does this application process work?

18    A     The application process was that any Kaiser

19 employee, who was interested in being considered for

20 employment with AKW, had to complete an application

21 form, and it had to be turned in by noon on April 8th,

22 1997.

23           Also, the memorandum talked about the steel

24 positions that would be available at AKW.

25           And that the applicant would have to have

1    satisfactory past performance in that position to be

2    considered.

3           And that successful applicants would have

4    to complete a preemployment physical exam and drug and

5    alcohol screen.

6    Q    Now, there are a couple of documents that

7    are attached to the internal memorandum.

8           And they start on page 4 of the document.

9           What are these attachments?

10   A    The first attachment is an application for

11   hourly employment with a PWLP, which is four pages.

12          There is a preemployment survey that was

13   attached that had to do with the application process

14   as well.

15          And then the last attachment is a list of

16   classifications that would be available at AKW.

17   Q    Now, were all of the Kaiser employees, who

18   were interested in employment with AKW, was this the

19   application form that was used for all of those

20   individuals?

21   A    Yes.  It is.

22   Q    And then what is this last page marked

23   appendix B?

24   A    Those were the startup classifications that

25   would be available at AKW effective May 1, 1997.

1          He was the chief spokesperson for Accuride.

2     Q     Okay.

3          So describe for us what is Company 2?

4     A     This is a letter from Phil Miscimarra to

5   Doug Ferguson and Joe Orlando.

6          And it addresses the provisions of opting

7   down to employee only coverage for AKW active

8   employees and opting out of AKW coverage for Kaiser

9   retirees who became AKW employees.

10    Q     First, let me make sure I understand these

11  terms.

12          Opting down.

13          What does opting down refer to in the

14  context of an employee who is transitioning from

15  Kaiser to AKW employment?

16    A     Opting down provision allowed an employee,

17  if they had coverage, medical coverage with someone

18  other than Kaiser or Accuride to opt down to employee

19  only coverage.

20          And they would have to not cover their

21  dependents, if they could show they had proof for

22  their dependents.

23    Q     They could waive coverage for their

24  dependents and presumably not have to pay whatever

25  contributions might be associated with premiums for

1   dependents.

2           Is that correct?

3   A       Yes.

4   Q       Opting out.

5           That is a different concept.

6           Correct?

7   A       Yes.

8   Q       In the context of, again, an employee

9   transitioning from Kaiser to AKW employment, how does

10  opting out apply to that situation?

11  A       The opting out provision was for Kaiser

12  retirees, who came over -- or became AKW employees.

13          And they had to make an election to either

14  have their medical coverage through Kaiser while

15  actively employed at AKW or they could elect AKW

16  medical coverage while an active employee at AKW.

17  Q       Are you familiar with the medical benefits

18  Kaiser provided to its retirees?

19  A       Yes.  I am.

20  Q       And what were those benefits?  Describe the

21  program for us?

22  A       Well, it was a medical plan through I

23  believe at that time it was Highmark.

24          They had an HMO plan.  And a point of

25  service plan.

1          And there were provisions based on points.

2          If an employee had 85 points, if they took

3    retirement from Kaiser, they would receive

4    precoverage.  There would be no contribution required.

5      Q     And with respect to the entire group of

6    Kaiser employees, who were transitioning to employment

7    with AKW, again, there were some employees among that

8    group, who were eligible for a Kaiser retirement?

9      A     That's correct.

10     Q     And so they potentially had the opportunity

11   to be covered by Kaiser's retiree medical coverage.

12          Correct?

13     A     That's correct.

14     Q     So how would the opting out process work,

15   once these individuals became AKW employees?

16     A     They were given a form, an election form.

17          And they had to decide, while they were an

18   active employee at AKW, Kaiser retiree, did they want

19   to be covered by Kaiser retiree medical and life plan

20   or did they want to be covered by the AKW medical and

21   life plan while active.

22     Q     Is that essentially the substance of the

23   proposal described in Company Exhibit 2?

24     A     Yes.  It is.

25     Q     What were the requirements of the opt-out

1 election that was made available to AKW employees, who

2 also were Kaiser retirees?

3     A    A Kaiser retiree could elect to participate

4 in the AKW medical plan, if they so wanted to.

5             And at the time, if they did take

6 retirement at AKW at a later date, then they would

7 become covered under the Kaiser retiree medical plan.

8             It was a one time voluntary election

9 permanent.

10            It could not be changed at a future date.

11            They could also, of course, stay with the

12 Kaiser plan and not participate in the AKW plan.

13    Q    I will ask you to look at another letter.

14            And also ask that that be marked as Company

15 Exhibit 3.

16            (Thereupon, Company Exhibit No. 3 was

17         marked for identification.)

18    Q    What is this letter?

19    A    This is a letter from Phil Miscimarra

20 addressed to Doug Ferguson and Joe Orlando.

21    Q    Let me just stop you for a second.  Who is

22 Joe Orlando?

23    A    Joe Orlando was the international rep with

24 UAW.

25    Q    And Doug Ferguson was the president of the

1  local?

2      A      Yes.  He was.

3      Q      I am sorry.  I interrupted.

4      A      This letter is addressing the opting down

5  provision for Kaiser retirees.

6              It also addresses a question raised by Joe

7  Orlando regarding changing the option of election in

8  the future.

9      Q      The letter refers to a question that

10  Mr. Orlando had for Mr. Miscimarra, correct?

11      A      Yes.  It does.

12      Q      How does Mr. Miscimarra answer that

13  question in the letter?

14      A      The question was Joe asked whether Kaiser

15  retirees who worked for AKW can elect Kaiser retiree

16  insurance with an additional option of changing their

17  election in the future.

18              Mr. Miscimarra responded this additional

19  option would not be available.  And the Kaiser

20  retirees who worked for AKW would have to elect Kaiser

21  retiree insurance coverage on the one hand or elect

22  AKW coverage on the other hand as a one time

23  irrevocable decision.

24      Q      I have another document for you to look at,

25  please.

1          I will ask for this to be marked Company

2    Exhibit 4.

3          (Thereupon, Company Exhibit No. 4 was

4      marked for identification.)

5          THE ARBITRATOR:  Company Exhibit 4 is the

6      April 13th, 1997 ratification meeting summary?

7          MR. MINER:  Correct.

8    BY MR. MINER:

9      Q     Pat, what is this document?

10     A     This is a document prepared by Phil

11   Miscimarra.

12          It is just a summary of the tentative

13   agreement that he prepared for the union to distribute

14   or review with the membership.

15     Q     Does the ratification summary discuss the

16   opting out and opting down provisions that you already

17   described in the foregoing letters?

18     A     Yes.  It does.

19     Q     And where does it describe those issues?

20     A     It is on page 9.

21          There is opting out, opting down document.

22     Q     Just with respect to the issue of opting

23   out by Kaiser retirees, who were now going to become

24   AKW employees, what was the summary in the

25   ratification summary?

1    A    The summary states that Kaiser retirees who

2  were hired as AKW employees and who retired from

3  Kaiser by September 15th, 1997 could make an election

4  to either have Kaiser retiree medical life or AKW

5  medical life insurance for themselves and dependents.

6             And it talks -- the document also explains

7  if the Kaiser retiree elected coverage, they would

8  participate in Kaiser insurance and will not have any

9  future AKW insurance.

10    Q    Where are you reading from?  I can see you

11  are reading from the document.

12    A    Yes.

13             I am reading under the heading called

14  "Agreement".  Just reviewing those bullets, 1, 2, 3, 4

15  and 4A.

16    Q    Great.  Thank you.

17             I will give you another document.

18             This has already been marked Company

19  Exhibit 5.

20             (Thereupon, Company Exhibit No. 5 was

21        marked for identification.)

22    Q    What is Company 5?

23    A    This is an internal memorandum that I

24  prepared and distributed to the AKW startup hourly

25  employees in May of 1997.

1   Q      And who were the startup hourly employees?

2   A      Those were Kaiser employees who came over,

3   applied for and became AKW employees.

4   Q      Okay.

5          So these were already AKW employees by the

6   time Company Exhibit 5 was distributed to them.

7          Correct?

8   A      Yes.

9          The date is May 9th, 1997.

10  Q      Okay.

11         And what is the subject of this internal

12  memo?

13  A      The subject matter is opting down

14  provisions and then opting out provisions for the

15  Kaiser retirees, who became AKW employees.

16  Q      Again, specifically with respect to the AKW

17  employees who also were Kaiser retirees, what does the

18  memo say about the opting out issue?

19  A      The memo states that Kaiser retirees would

20  have an irrevocable one-time voluntary election to opt

21  for Kaiser retiree medical coverage or opt for AKW

22  medical and life coverage while actively employed at

23  AKW.

24         And that the Kaiser retirees -- this option

25  would be permanent and irrevocable.

1          And that it could not be changed at future

2    time.  Election couldn't be changed at a future time.

3          Q     Where are you reading from, again, on this

4    document?

5          A     I am on page 2 of the memorandum.  Under

6    item No. 1.

7          Q     Where it says, "Opting out of AKW insurance

8    in favor of Kaiser retiree insurance"?

9          A     Correct.

10          Q     There are a couple of documents attached to

11    this memo as well.

12          Can you just identify what those documents

13    Mr?

14          A     The first document is the opt-down form,

15    where you could opt down to employee only coverage.

16          And the second attachment is the one-time

17    irrevocable election form for Kaiser retirees.

18          Q     Is this the form that was actually used by

19    the AKW -- the AKW employees, who were Kaiser

20    retirees, is this the form they actually used to make

21    the election?

22          A     Yes.  It is.

23          Q     What does the form say about the election?

24          A     The form states that it is a one-time

25    irrevocable election, that the employee could --

1  Kaiser retiree could elect to participate in the

2  Kaiser retiree plan while actively employed at AKW.

3              That the election would be permanent and

4  irrevocable.

5              And that dependents and as well as the

6  retiree would not be covered at any future time by any

7  AKW medical and life insurance.

8              And the second option is they could elect

9  AKW coverage while actively employed.

10     Q     Did you receive election forms from all of

11  the Kaiser retirees who became AKW employees?

12     A     There were a couple that were not returned.

13              But the majority of the forms were returned.

14     Q     Did any employee select to be covered under

15  AKW medical coverage?

16     A     Yes.  They did.

17     Q     Just so I am clear, did any of the

18  employee -- any of the AKW employees, who were

19  eligible for Kaiser retiree medical, did any of them

20  elect to receive AKW medical coverage?

21     A     Yes.

22     Q     And are they continuing to be participating

23  in the AKW medical plans up to this time?

24     A     Yes.

25     Q     And with respect to those AKW employees,

1   who were eligible to receive Kaiser retiree medical,

2   who chose to elect Kaiser retiree medical, were any of

3   those individuals covered by AKW medical coverage at

4   any subsequent time?

5        A     No.

6        Q     Do you know who Joe Matczak is?

7        A     Yes.  I do.

8        Q     Who is Joe Matczak?

9        A     He was or is an employee at AKW who was

10  also a Kaiser retiree.

11       Q     Did he submit an election -- an election

12  like the form attached to Company 5?

13       A     I believe so.

14             I have to check my documents.

15       Q     Did he elect Kaiser retiree medical

16  coverage?

17       A     Yes.

18       Q     And did he receive Kaiser retiree medical

19  coverage, to your knowledge?

20       A     Yes.  He did.

21       Q     Did he -- was he covered under the AKW

22  medical plan?

23       A     No.

24       Q     Did he request coverage under the AKW

25  medical plan?

1    A    Yes, he did.

2    Q    Was it approved or denied?

3    A    It was denied.

4    Q    Did he grieve that decision?

5    A    Yes.  He did grieve.

6    Q    And what was the result of that grievance?

7    A    The grievance was denied.

8    Q    Was that grievance taken to arbitration?

9    A    Yes.  It was.

10    Q    Let me mark this as Company 6.

11    (Thereupon, Company Exhibit No. 6 was

12    marked for identification.)

13    THE ARBITRATOR:  You refer to this as the

14    Gerhart opinion?

15    MR. MINER:  Yes.

16    THE ARBITRATOR:  Just keep it simple.

17    Okay?

18    MR. MINER:  Thank you.

19    Q    What is the Gerhart decision's conclusion

20    with respect to the grievance?

21    A    The conclusion was that the grievance was

22    denied.

23    Q    And what was the basis for denying the

24    grievance?

25    A    The basis was that there was not a dispute

1    that the grievant had opted out of AKW coverage and

2    chose Kaiser retiree coverage, when he retired.

3            Mr. Matczak attempted to enroll in the AKW

4    coverage.  And the company properly denied him that

5    option pursuant to the letter of agreement.

6            And also it is noted that Kaiser was in

7    bankruptcy.  And the union had asked the arbitrator if

8    Kaiser is solely responsible for Kaiser retiree health

9    care coverage for those working in AKW, because of the

10   opting out opting down language, and if Kaiser is no

11   longer a party to the collective bargaining agreement,

12   who will provide health coverage for Kaiser retirees

13   working at AKW.

14           The arbitrator stated it is a reasonable

15   question, but not one for the arbitrator to answer.

16   There is nothing in the agreement that suggests the

17   parties mutually agreed to put such a question before

18   a grievance arbitrator.

19       Q    When was this award issued?

20       A    This award was issued September 26th, 2003.

21       Q    And at the time, Kaiser was in bankruptcy

22   proceedings?

23       A    Yes.  They were.

24       Q    Do you know what the status of those

25   proceedings is today?

1    A    They did do the bankruptcy.

2    And I know that the Kaiser retiree medical

3  plans were terminated as of May 31st, 2004.

4    Q    I will ask for you to look at this

5  document.  And also ask that this be marked Company 7.

6    (Thereupon, Company Exhibit No. 7 was

7    marked for identification.)

8    MR. McGOWAN:  The only issue I have on

9    Company 7 is what is its relevance to the issue

10    on clarifying the provisions of Joint Exhibit 4,

11    which is the previous contract?

12    MR. MINER:  I think what Pat will explain

13    is this is the notice that the company received

14    that Kaiser was requesting the bankruptcy court

15    for permission to terminate its retiree medical.

16    And that precipitated a response from

17    Accuride that resulted in some negotiations in

18    2004.

19    MR. McGOWAN:  Negotiations with whom?

20    MR. MINER:  With the UAW.

21    This is simply --

22    THE ARBITRATOR:  Just let her explain what

23    it is.  I think you just explained what it is,

24    though.

25    MR. MINER:  I think I did.  Correct me, if

1      will take a break.

2                      CROSS EXAMINATION

3  BY MR. McGOWAN:

4      Q      A couple questions on cross examination.

5              The Company Exhibits that you testified to,

6  including the -- I will take you through Exhibits 1

7  through 6.

8              Can you tell me which collective bargaining

9  agreement these documents all pertain to and

10 reference?

11     A      It was the collective bargaining agreement

12 that was effective, would have been effective -- May 1

13 of 1997.

14             THE ARBITRATOR:  Is that a Joint Exhibit?

15             THE WITNESS:  This is the agreement that I

16     was just handed is dated -- it is August 18th,

17     1998.

18             MR. MINER:  And you are referring to Joint

19     Exhibit 4.

20             THE WITNESS:  Right.

21             THE ARBITRATOR:  These all came under Joint

22     Exhibit 4.

23 BY MR. McGOWAN:

24     Q      Do any of the exhibits you testified to --

25 strike that question.

1          Take a look at paragraph 14 of Joint

2   Exhibit 3.

3          That paragraph provides that employees may

4   opt out of medical coverage so long as 75 percent of

5   the employees participate in the plan, in the

6   company's medical plan.

7          What is the significance of that 75 percent

8   participation requirement?

9      A     That participation would impact the rights

10  that would be charged by the insurance carrier.

11     Q     So that 75 percent figure, that is a

12  requirement of the carrier?

13     A     That's correct.

14         That is their standard language in their

15  contract.

16         THE ARBITRATOR:  It impacts your rate, how

17     much they are going to charge you per employee

18     based upon volume of employees.  Is that

19     correct?

20         THE WITNESS:  It would impact the premiums

21     that we would be charged for the coverage.

22  BY MR. MINER:

23     Q     What would happen to the rates, if that

24  provision were not in the contract with the medical

25  provider?  Just so I understand.

1      A     The rates probably would increase.

2            MR. MINER:  Thank you.

3            MR. McGOWAN:  Just one other question.

4                    RECROSS EXAMINATION

5  BY MR. McGOWAN:

6      Q     So the company's security on maintaining --

7  is it fair to say the company's security at

8  maintaining negotiated or acceptable rates with the

9  carrier is dependent upon maintaining the 75 percent

10  minimum level of participation?

11      A     Yes.

12            MR. McGOWAN:  No further questions.

13            THE ARBITRATOR:  Okay.  We will take a five

14      minute break.

15            (Recess taken.)

16            MR. MINER:  I have one followup question

17      for Pat Wolf.

18                    REDIRECT EXAMINATION

19  BY MR. MINER:

20      Q     Looking back at Joint Exhibit No. 3, I was

21  asking you to look earlier at paragraph 14.

22            I asked you about the 75 percent

23  participation figure.

24            Was that -- with respect to the premiums

25  that were calculated in August of 2003 with the

1   medical provider, was that 75 percent participation

2   figure calculated with respect to the entire universe

3   of Accuride Erie, LP employees, or did it exclude the

4   Kaiser retirees, who had opted out of AKW medical

5   coverage?

6       A     It excluded the Kaiser retirees.

7             MR. MINER:  Thank you.

8             That is the only additional question I

9       have.

10            MR. McGOWAN:  Just a couple of questions on

11      cross to clarify.

12                      RECROSS EXAMINATION

13  BY MR. McGOWAN:

14      Q     The provision you were talking about, the

15  75 percent minimum participation level, can you tell

16  me in what document that it came from?

17      A     It came out of the Health America contract

18  agreement.

19      Q     And specifically, on the company documents

20  that were presented, what year were you talking about

21  on that document, that 75 percent pertained to?

22      A     The Health America plans became effective

23  October 1, 2003.

24      Q     And if you could help me out, Fred, where

25  was the company document you were referring to on the

1  75 percent?

2          MR. MINER:  Joint 3, paragraph 14.

3      Q     So the 75 percent level excluded the

4  employees, who were then receiving medical insurance

5  through Kaiser?

6      A     The Kaiser retirees, yes, that were not

7  participating in the AKW plans.

8      Q     And no further questions.

9          THE ARBITRATOR:  Union may go ahead and

10         present the information in a way you are

11         comfortable.

12         MR. McGOWAN:  I will call to the stand Gary

13         Montroy.

14                     GARY MONTROY

15  called as a witness by the union, having been first

16  duly sworn, as hereinafter certified, was examined and

17  testified as follows:

18                  DIRECT EXAMINATION

19  BY MR. McGOWAN:

20      Q     Gary, could you state your name and spell

21  it, please?

22      A     Gary Montroy.  M-O-N-T-R-O-Y.

23      Q     And are you currently employed by Accuride

24  Erie, Gary?

25      A     Yes.  I am.

1      Q      And did the union ever raise the issue or

2  propose that the transitional terms be included in the

3  new contract?

4      A      Yes.

5              Doug Ferguson, our president, proposed that

6  we continue to keep those transitional issues in the

7  contract.

8      Q      And how did the company respond to that

9  proposal?

10      A      The company didn't really want to keep

11  them.

12              They were hesitant in keeping anything.

13      Q      And did the company ever respond in any

14  transitional issues in the settlement agreement in

15  front of you?

16      A      It was some time afterwards, we had

17  questions on seniority.

18              For instance, myself, Accuride was in

19  business for seven years, but I got 32 years of

20  seniority.  How is that going to be explained?

21              How is that going to be taken with our

22  pension, involvement with our pension and stuff?

23              And we were concerned that it wasn't

24  explained in the present contract.

25              And there were other issues in the

1  transitional issues that we wanted --

2      Q     Do any of the transitional issues appear in

3  the memorandum of settlement?

4      A     Yes.

5            Those issues, which the company felt that

6  they could go along with, were added.

7      Q     And can you point those out to us in the

8  memorandum?

9      A     Yes.

10           It starts on page 6, title "transitional

11  issues".

12           Paragraph 22.

13           And it goes on to page 7.

14           And it has 22A, B, C and D.

15     Q     And in paragraphs A, B, C and D, in the

16  memorandum of settlement, do any of those refer to any

17  continuation of the letter of agreement or medical

18  insurance opt-out provisions?

19     A     No.

20     Q     Right now the current contract and

21  negotiations, did you negotiate with any

22  representatives of Kaiser for the current collective

23  bargaining agreement?

24     A     No.

25     Q     Were any representatives of Kaiser present

1  medical?

2      A      No.

3      Q      You weren't.

4              So you didn't have the opportunity to make

5  an election regarding Kaiser retiree medical versus

6  AKW medical?

7      A      No.

8      Q      How about those employees that were

9  eligible for Kaiser retiree coverage.

10             Are you aware of employees in the plant who

11  elected Kaiser retiree coverage?

12     A      Yes.  I am aware of employees who did that.

13     Q      They were not covered, correct; during the

14  term of the expired agreement, Joint Exhibit 4, the

15  prior agreement, the '98 through 2003 agreement?

16     A      Covered by?

17     Q      Covered by AKW medical coverage.

18     A      No.

19     Q      When did they become eligible for Accuride

20  medical coverage?

21     A      When did they become eligible?

22     Q      Yes.

23             What is the union's position on that?

24     A      As of the beginning of September.

25  September 1st.

1    Q    Did any of those folks request coverage
2  under the company's medical plan?
3    A    Not that I am aware of.
4    Q    Do you know when the first time was that an
5  individual requested coverage under the company's
6  medical plan since September 2003?
7    A    I believe it was when a company posted that
8  the Kaiser employees' insurance was going to be
9  terminated.
10    Q    Do you know how the request was made to the
11  company for those employees to be covered?
12    A    How the request was made?
13    Q    Yes.
14        Did the union present the request?  Did
15  individual employees make the request?
16        Did they submit application forms?
17        How was request made?
18    A    I can't recall.
19        It seems to me that the union requested in
20  a number of meetings that the company should be
21  picking up that insurance when Kaiser insurance was
22  dropped.
23    Q    Are you familiar with the Matczak
24  arbitration case?
25    A    Vaguely.

1          THE ARBITRATOR:  And decide if you have

2     anything else.

3          MR. McGOWAN:  I don't know if we will have

4     any further witnesses, because in order to avoid

5     redundancy.

6          THE ARBITRATOR:  I don't want to hear

7     anything twice.

8          (Recess taken.)

9          THE ARBITRATOR:  Anything additional?

10          MR. McGOWAN:  Yes.  A couple of questions

11     on redirect.  Then I think we will be finished

12     with the witness.

13          THE ARBITRATOR:  Okay.

14  BY MR. McGOWAN:

15     Q     I would like to direct your attention,

16  Gary, to Joint Exhibit No. 2.  The grievance packet.

17          Can you tell me what date that grievance

18  was filed?

19     A     June the 8th of '04.

20     Q     And can you tell me why it was filed in

21  June?

22     A     Those persons were covered by the Kaiser

23  insurance.

24          That insurance ended, I think it was May

25  31st.

1          And we requested from the company to cover

2    them.

3          They denied that request.

4    Q     And approximately, to the best of your

5    memory, when did you make the request to the company

6    to cover the Kaiser -- by Kaiser retirees, were these

7    people ex-employees of Accuride, or were they

8    currently actively working at Accuride as employees?

9    A     They were active employees.

10         And if I am not mistaken, at a couple of

11   grievance meetings we requested that knowing this was

12   going to happen.  And the company called a couple

13   meetings.  We had a couple meetings with the company.

14         And they denied us coverage for these

15   employees.

16         And then we filed a grievance.

17   Q     Do you recall during -- previous to the

18   filing of that grievance, during those meetings with

19   the company, what was the union's position on why the

20   company should present health insurance for those

21   employees?

22   A     We felt that under the current contract,

23   they could pick up the AKW insurance.

24         This insurance was dropping.  We felt we

25   could pick it up.

1   knowledge, of the meeting that you missed?

2       A    The meeting I missed was a session that was

3   set up for Health America officials to come in and

4   explain some of their policies in greater detail.

5       Q    During the negotiation process leading up

6   to the achievement of the 2003 collective bargaining

7   agreement, was there any bargaining over the subject

8   of the Joe Matczak grievance that had been submitted

9   to Arbitrator Gerhart?

10      A    No.

11      Q    When did that award issue?

12      A    I think the award came out in September of

13  2003.

14           I think it was September 26.

15      Q    And the new agreement came in to effect

16  September 1st.  Correct?

17      A    Right.

18      Q    During the negotiations leading up to the

19  achievement of the new agreement, was there any

20  bargaining over the subject of covering the employees,

21  who had elected to receive Kaiser retiree medical and

22  opted out of AKW medical?

23      A    No.

24      Q    What is the status of the Kaiser retiree

25  medical plan, to the best of your knowledge?

1      A      Our thought in May of 2004 was that it was

2    going to be terminated May 31st, 2004.

3            But I have not heard anything definite on

4    that either way.

5      Q      How did you get notice of Kaiser's

6    intention with respect to its retiree medical?

7      A      Probably it was teed up through Pat.

8            I know we began having some discussions

9    probably late first quarter of 2004 about the fact

10   that it looked like Kaiser was going to terminate

11   their retiree medical insurance for both hourly and

12   salary groups.

13           And I think we probably were aware there

14   was a date of 5-31-04 that was out there.

15     Q      I will give you a series of documents and

16   ask you to look at them and identify them.

17           I think we are up to Company Exhibit No. 8.

18           (Thereupon, Company Exhibit No. 8 was

19      marked for identification.)

20     Q      I will share that document with you.

21           And also ask that this letter be marked

22   Company 8.

23           Are you familiar with this?

24     A      Yes.

25           MR. McGOWAN:   The only issue I am going to

1    be raising on this is since this is -- and I am

2    going to assume some subsequent documents that

3    may be provided by the company are negotiations

4    in an attempt to settle the issue in front of the

5    arbitrator.  They basically constitute parties'

6    proposals on settlement issues.

7         And as such, it is my understanding that

8    they should be excluded from presentation before

9    the arbitrator.

10         THE ARBITRATOR:  Does this contain

11    settlement offers?

12         MR. MINER:  No.  The grievance had not even

13    been submitted at the time this --

14         THE ARBITRATOR:  If this document itself

15    doesn't contain settlement offer --

16         MR. McGOWAN:  If I may proceed, the

17    grievance was filed in June because the actual

18    occurrence of the violation occurred in June due

19    to the company's continued refusal to provide the

20    insurance.

21         The parties were well aware that this

22    action of the insurance termination was going to

23    occur well before the filing of the grievance.

24         Pursuant to that, and the parties then

25    engaged in several meetings over this issue,

1    proposals were put back and forth to settle the

2    issue.

3         THE ARBITRATOR:  But we aren't going to

4    talk about those proposals.  I am just letting

5    you put this document in the record.  If he tries

6    to go in to something objectionable, you can

7    repeat your objection, and I will not let you get

8    in to settlement negotiations.

9         MR. McGOWAN:  Well, this document does

10   contain settlement terms.

11        THE ARBITRATOR:  Where is that?

12        MR. MINER:  It does not contain settlement

13   terms concerning any grievance that was alive at

14   any time in April of or May of 2004.

15        The grievance was submitted later.

16        This document reflects an offer by the

17   company to provide benefits to its employees that

18   it had no obligation to make.

19        And nevertheless, proposed to make in order

20   to alleviate the impact on this group of its

21   employees, who were experiencing the effect of

22   Kaiser's termination of its retiree medical.

23        MR. McGOWAN:  And I have no contest to

24   exactly what you said from your perspective.

25        However, during this entire process, and

1    during this period of time, the union was taking

2    the position that the company pursuant to the

3    contractual terms had to provide the insurance to

4    these affected employees, the same as any other

5    employee group.

6        THE ARBITRATOR:  Is any proposal in here

7    not uniform or the same as the benefits offered

8    to the Kaiser retirees who elected to stay with

9    AKW insurance?

10        MR. MINER:  This bargaining process only

11    dealt with those individuals who would be

12    affected by Kaiser's termination.

13        THE ARBITRATOR:  You didn't understand my

14    question.

15        If I were a Kaiser employee -- Thomas Duda,

16    I remember reading that name.

17        Thomas Duda elected not to go with Kaiser.

18        Thomas Duda, presumably, if he were still

19    employed, say he is, he has the AKW insurance.

20        MR. MINER:  Yes.

21        THE ARBITRATOR:  So he is similarly

22    situated to any Kaiser retiree employee at the

23    time of the irrevocable election.

24        MR. MINER:  Correct.

25        THE ARBITRATOR:  Now, is what you are

1    offering in this document different than what

2    Thomas Duda has?

3         MR. MINER:  Yes.

4         THE ARBITRATOR:  Then it is a settlement

5    offer.  I will disregard anything that is content

6    wise as a settlement offer.

7         MR. MINER:  The purpose of excluding

8    settlement discussions is to encourage resolution

9    of disputes between the parties.

10        If it were the case that bargaining

11   concerning issues that are raised by later filed

12   grievances could not be considered in an

13   arbitration, we would never get in to any

14   bargaining history.

15        This is bargaining --

16        THE ARBITRATOR:  I will let you put the

17   document in, but I am not going to give any

18   weight to settlement offers or anything perceived

19   to be a settlement offer within the document.

20        MR. McGOWAN:  Then in the issue of

21   fairness, the union requests that one more

22   document be presented.

23        THE ARBITRATOR:  You can present that.

24        MR. McGOWAN:  It is in regards to these

25   documents you are presenting.

1          THE ARBITRATOR:  You can supplement the

2     record.

3          I am saying I agree with your objection, to

4     the extent anything contains a settlement offer,

5     because ultimately, the same issue is now before

6     me.  Whether the grievance was filed then or

7     there, here is where we are.

8          So it is in the record.  Let's move on.

9     You guys are nitpicking, you are bickering.

10          Continue.

11  BY MR. MINER:

12     Q     Mike, what is the document, what is Company

13  Exhibit 8?

14     A     Well, it is a letter that we provided to

15  the union explaining proposals that we prepared to

16  address the potential situation where the Kaiser

17  employees would be without insurance of Kaiser as

18  retirees.

19     Q     As of April 2nd, 2004, that is the date on

20  the letter, right?

21     A     I am sorry?

22     Q     What is the date?

23     A     April 2nd, 2004.

24     Q     As of April 2nd, 2004, what was the

25  company's position with respect to its potential

1    liability or its obligation to provide medical

2    benefits for the employees, who had elected to receive

3    Kaiser medical benefits?

4        A    We felt there was no contractual obligation

5    to provide that coverage.

6        Q    So why send Company Exhibit 8; what was the

7    purpose of the April 2nd letter?

8        A    Well, we were looking at a potential

9    situation where the employees would be without

10   insurance.  And we wanted to try and address that.

11       Q    So what were the company's proposals?

12       A    What we call proposal A --

13           THE ARBITRATOR:  If it is in the letter,

14   you don't need to go in to it.  Now we are

15   getting in to settlement details.  I don't need

16   to have that.

17           You took the position you weren't obligated

18   to do anything.  You made a proposal to do

19   something.

20           They rejected it and said it should be

21   treated like everybody else.  And here we are.

22           MR. MINER:  Fair enough.

23           THE ARBITRATOR:  And I presume that nothing

24   was unilaterally implemented for these employees

25   over the union's objection.  Because I understood

1          from the opening statement --

2                  MR. McGOWAN:  Nothing other than the

3          absence of insurance.

4                  THE ARBITRATOR:  That is what I meant.  So

5          you didn't go forward and just say we are going

6          to do this regardless and the union's objection.

7   BY MR. MINER:

8          Q     Is that correct, Mike?

9          A     Yes.

10                 THE ARBITRATOR:  That is why we are here.

11                 Do you want to put that supplemental

12         document in now?

13                 MR. MINER:  I have a few additional

14         documents first.

15         Q     After this letter was sent to Mr. Ferguson,

16   were there meetings between the company and the union

17   to discuss the contents of the letter?

18         A     Yes.  We met two days, May 13th and 14th,

19   here in Erie.

20         Q     May 13th and 14th of 2004?

21         A     Yes.

22         Q     Were there any other meetings to discuss

23   this letter?

24         A     No.

25         Q     What was the union's position at the

1   meetings?

2       A       Well, initially, they had first day there

3   were a lot of questions about the programs mentioned

4   in the letter.

5               The second day, we were able to respond to

6   a lot of their questions based on information we had

7   pulled off the IRS web site about the health care tax

8   credit program.

9               And when the parties left on the 14th, they

10  were going to take -- my understanding is they would

11  take it to the membership to make a determination

12  whether or not to accept what we suggested.

13      Q       Did the union take the position that the

14  company was obligated to include the employees, who

15  had opted out of AKW medical coverage in the AKW

16  medical plan, in the company's medical plan?

17      A       Yes.

18              That is when they brought up the argument

19  about the last paragraph of the memorandum of

20  understanding.

21      Q       What was the company's response to that?

22      A       Well, we said that employees made a

23  one-time irrevocable election back in '97.

24              And that --

25              THE ARBITRATOR:  This is all repetitive.  I

1    understand what you did.

2        Q    But there was that discussion at the

3    meeting?

4        A    Yes.

5        Q    Great.

6            THE ARBITRATOR:  There was no meeting of

7    the minds, so I am here.

8        Q    There was no meeting of the minds, correct?

9        A    Correct.

10       Q    Company Exhibit 9.

11           (Thereupon, Company Exhibit No. 9 was

12    marked for identification.)

13           MR. MINER:  Maybe this is the letter you

14    were going to suggest.

15           MR. McGOWAN:  Yes.

16       Q    What is this document, Mike?

17       A    It is a letter I received from Mr. McGowan.

18           It is dated I think June 7th is when I

19    received it.

20       Q    What is the letter --

21           THE ARBITRATOR:  It speaks for itself.

22       Q    I will offer one more letter, I think.

23    This will be Company 10.

24           (Thereupon, Company Exhibit No. 10 was

25    marked for identification.)