# OPINION AND AWARD

|  |  |
|---|---|
| In the Matter of Arbitration<br><br>Between<br><br>AKW, LP<br>Erie, Pennsylvania<br><br>And<br><br>UNITED AUTOMOBILE,<br>AEROSPACE & AGRICULTURAL<br>IMPLEMENT WORKERS OF<br>AMERICA, Local 1186, AFL-CIO | **Federal Mediation and<br>Conciliation Service**<br><br>Case No. 01-15651<br>Parties' Grievance: 01-2-HR;<br>    Health Insurance Eligibility<br>Hearing: January 16, 2003<br>Briefs Rec'd: March 5, 2003<br>Award: September 26, 2003<br>Arbitrator: Paul F. Gerhart |

## Present for the Hearing

**For AKW, LP:**

> Frederick C. Miner, Esq., Attorney, Ryley, Carlock &
>     Applewhite, Phoenix, AZ
> Michael Pinson, Human Resources Manager, AKW
> Pat Wolfe, Director of Compensation and Benefits, Accuride
>     Corp.
> Robert Nida, Director of Technology and Continuous
>     Improvement, Accuride Corp.

**For United Automobile, Aerospace and Agricultural
Implement Workers of America, Local 1186:**

> Joseph J. Orlando, Jr., International Representative, District 9
> Douglas Ferguson, President, Local 1186
> Ronald Celeski, Recording Secretary, Local 1186

01-896fmcs

## Background

The United Automobile, Aerospace and Agricultural Implement Workers of America, Local 1186 (the Union) is the bargaining representative for certain employees of AKW, LP, Erie, Pennsylvania (the Company). During the term of their 1998-2003 Agreement (JX 1, the "Agreement"), the parties were unable to resolve a dispute involving health insurance eligibility for the grievant, Joe Matczak. Under the provisions of the Agreement, Article 4, Adjustment of Grievances, the undersigned arbitrator was appointed by the Federal Mediation and Conciliation Service to issue a final and binding decision on the matter. .

Upon the mutual agreement of the parties, oral hearing was conducted at the Comfort Inn, Erie, Pennsylvania, on January 16, 2003. At the outset of the hearing, the Company indicated it had an objection based on the arbitrability of the matter but that it was prepared to present evidence regarding that issue along with evidence on the merits rather than to bifurcate the hearing. The Union agreed to this procedure (Tr 4).

Both parties examined witnesses and presented other evidence in support of their respective positions. Witnesses were sworn but not separated. A stenographic record of the testimony was made by Lance E. Hannaford, Court Reporter, of Morse, Gantverg & Hodge, Inc., Erie, PA. At the conclusion of the presentation of evidence, the parties waived oral argument and agreed to submit post-hearing briefs. Briefs were timely received from both parties on or before March 5, and cross-mailed by the arbitrator on April 17, 2003, at which time, the record in the matter was closed.

## Grievance

On February 16, 2001, the grievant, Joe Matczak, and his department steward, Leroy Albert, filed the following grievance (JX 2):

Section of the contract claimed to have been violated: Art #1, Sec. D; Art. #20, Sec. F

Nature of Grievance: I protest management's actions in refusing to cover myself and my dependents with insurance as they do for other AKW employees. I charge management with age discrimination against myself and my family. I am retired from Kaiser and working for AKW. My status as a retiree should have no bearing on my insurance coverage

with AKW. I request AKW insurance from the date Kaiser sold out to AKW and all bills be paid from that date forward.

The grievance was denied at all steps of the grievance procedure and is now before the arbitrator for final and binding resolution.

## Relevant contractual provisions

### ARTICLE 4
### ADJUSTMENT OF GRIEVANCES

**Section A. Purpose**
It is the intent and purpose of this Article 4, which shall be available to both the Company and the Union, to provide for the presentation and equitable adjustment of grievances.

**Section B. Purpose**
Any grievance arising under this Agreement or with respect to any terms or conditions of employment of the employees covered by this Agreement, shall be presented either through the proper Union representative or representatives or directly by the individual employee or group of employees involved, within fifteen (15) working days after the occurrence of the grievance, or shall be deemed to have been waived by the aggrieved party. Such fifteen (15) day period may be extended by mutual agreement for reasons of vacation, sickness and leaves of absence. Such grievances shall be presented to the proper representatives of the Company in the following steps:

Step 1 – An employee or employees who feel they have a justifiable complaint or grievance shall discuss the matter with their immediate supervisor with or without their Union representative present. When a complaint has been so submitted, the supervisor shall give an answer within twenty-four (24) hours.

Step 2 – If the grievance is not satisfactorily solved in Step 1 above, then within five (5) working days thereafter, the aggrieved may reduce the grievance to writing on grievance forms provided by the Company; such is to be completed and signed by the employee or employees involved and their properly designated Union representative, and the completed grievance form then shall be delivered to the head of the department concerned or his designated representative. The head of the department or his designated representative shall, within five (5) working days from receipt of the written grievance, answer the grievance in writing and return it to the designated Union representative.

Step 3 – If the grievance is not satisfactorily solved in Step 2 above, then prior to the expiration of five (5) working days from the date the

137

grievance was returned by the Company to the Union representative, in compliance with Step 2 above, the Union may notify the Employee Relations Department in writing of appeal to Step 3. Such grievance shall then be discussed at a meeting or meetings to be held by the Union and the Employee Relations Department within ten (10) working days after the date of notice of appeal and a written disposition made thereof within ten (10) working days following the final Step 3 meeting. . . .

**Step 4** – Any grievance or dispute on the interpretation or application of the terms of this Agreement on which there is no satisfactory solution in Step 3, in absence of mutual agreement in writing to the contrary, must be appealed within ninety (90) days from the date of the disposition of the grievance in Step 3, by the accredited representative of the Union or the accredited representative of the Company, to an arbitrator whose decision shall be final and binding on the parties. . . .

**Section C. General**

1. Grievances by the Company and grievances of a general nature by the Union shall be initiated in Step 3 and by a written statement thereof served by the aggrieved party upon the other.

2. Failure by either party to process a grievance within the time limits set forth will be deemed to be a waiver of the grievance unless time extensions have been mutually agreed upon. In the event of a later recurrence of any situation which gives rise to the grievance so waived, such waiver shall not constitute a binding precedent upon either party on the merits of the particular grievance.

3. Written grievances which may affect the financial status of an employee that may be settled pursuant to the above procedure shall be made retroactive as to the financial adjustment to the date of the occurrence of said grievance, unless otherwise mutually agreed to by the Company and the Union.

# ARTICLE 16
## PENSION and GROUP INSURANCE BENEFITS

A. Pension

The Pension benefits shall be set forth in a Pension Agreement and such Agreement is incorporated herein and made a part of this 1997 Labor Agreement by such reference.

B. Group Insurance

1. The Group Insurance Benefits shall be set forth in booklets entitled Employee's Group Insurance Program and Retired Employee's Group Insurance Program, and such booklets are

incorporated herein and made a part of this 1997 Labor Agreement by such reference.

2. It is understood that this Agreement, with respect to insurance benefits, is an agreement on the basis of benefits and that the revised benefits shall become effective on or about May 1, 1997, except as otherwise provided in the applicable booklet, and further that such benefits shall remain in effect for the term of this 1997 Labor Agreement.

## ARTICLE 20
## GENERAL PROVISIONS

.    .    .    .    .    .

### Section F.  No Discrimination

It is the continuing policy of the Company and the Union that the provisions of this Agreement shall be applied to all employees without regard to race, color, sex, age, religious creed or national origin or handicap.  All provisions of this agreement shall apply alike (equally) to all male and female employees.  (Masculine pronouns or references in this Agreement shall be deemed to include feminine pronouns or references).

## Letter of Agreement

.    .    .    .    .

This letter confirms that agreement that has been reached concerning "opting down" and "opting out" issues under the Joint Venture ("AKW") group insurance plan. . . .

.    .    .    .    .

B.  "Opting Out" and Coordination of Kaiser/AKW Retiree Medical Insurance

The following policy has been agreed upon concerning the treatment of "opting out" issues and retiree medical and life insurance for those eligible AKW startup and substitute startup employees who, by September 15, 1997, have retired under the Kaiser hourly pension plan (these individuals are referred to below as "Startup Retirees"):

1) Startup Kaiser Retirees will be permitted to "opt out" of AKW medical/life insurance by making an irrevocable, one-time election, at the time they retire from Kaiser on or before September 15, 1997, to elect Kaiser retiree medical and life insurance coverage for themselves and any dependents in lieu of any AKW medical or life insurance coverage.  If these individuals elect Kaiser retiree

- 5 -

139

medical and life insurance coverage, they will not be covered at any future time by an AKW medical and life insurance.

2) If the irrevocable, one-time voluntary election by the Startup Kaiser Retirees is to elect AKW medical and life insurance coverage for themselves and any dependents, and where they satisfied all of the requirements of contribution-free Kaiser retiree medical insurance coverage as of September 15 1997 (i.e., they had 85 points), these individuals (and their dependents) will participate in AKW's medical and life insurance plan while working at AKW. When these individuals leave or retire from AKW, Kaiser rather than AKW will be responsible for providing any retire medical and life insurance.

3) If the irrevocable, one-time voluntary election by the Startup Kaiser Retirees is to elect AKW medical and life insurance coverage for themselves and their dependents, and where they have not satisfied all of the requirements for contribution free Kaiser retiree medical insurance coverage at of September 15, 1997 (i.e., they had less than 85 points), these individuals (and their dependents) will participate in AKW's medical and life insurance plan while working at AKW and following their departure or retirement from AKW.

4) Startup Kaiser Retirees who elect AKW coverage will not have the ability to "opt down" to single coverage based on any potential availability of dependent coverage under a Kaiser medical insurance plan. However, these Startup Kaiser Retirees, while covered under AKW medical insurance, may "opt down" to single coverage for themselves pursuant to Part A above (point 2) provided that the employee can verify coverage for their dependents from a source other than Kaiser.

## Issue

The Union proposed the following issues:

1. Did the Company violate Article 16, paragraph B, subparagraph 1 and 2 and Article 20, Section F of the Collective Bargaining Agreement when the Company, Accuride AKW, provided health care/group insurance benefits for some but not all of its employees and;

2. Did the company violate Article 4, Section B, Step 3, as it pertains to "time limits" by not answering the grievance in the specified/expressly negotiated time limits in the Labor Agreement?

The Company presented the following issue:

> Whether enforcement of the grievant's election of benefits violates the collective bargaining agreement? And if so, what is the appropriate remedy?

At the hearing, the parties agreed that the arbitrator should frame the issue(s) on the basis of the record as a whole. Accordingly, the issues are as follows:

1. Did the Company violate Article 4, Section B, Step 3, as it pertains to "time limits" by not answering the grievance within the negotiated time limits? If so, what is the appropriate remedy?

2. Did the Company violate any provision of the Agreement when it refused to enroll grievant in the AKW employee benefit plan? If so, what is the appropriate remedy?

**Position of the Union**

The following is the arbitrator's summary of the argument presented by the Union in its post-hearing brief.

In the fall of 1996, the Union was notified by Accuride and Kaiser Aluminum of Erie, that they had developed a Joint Venture and wanted to negotiate with the UAW a separate and stand alone Labor Agreement. From January 1997 through approximately May 1997, labor negotiations occurred with the outcome of a first time, two-year Labor Agreement between Accuride, Kaiser and the UAW – a three party Labor Agreement. During the 1997 negotiations, the parties negotiated a "transitional agreement" that dealt with the issue of hiring Kaiser employees by the Joint Venture. This "transitional agreement" is located in the current Agreement (JX 1) on pages 51 through 65.

During the course of these negotiations, because the Joint Venture was very interested in hiring Kaiser employees and also knew that certain Kaiser employees could retire from Kaiser and work for the Joint Venture, health care coverage became a topic of discussion specifically because Kaiser provided health care coverage for its retirees. The Joint Venture, more specifically, Kaiser of the Joint Venture, did not want to provide Kaiser retirees working for the Joint Venture dual coverage. Kaiser did not want to pay twice – once

through the Kaiser Retirement Pension Plan and again through working for the Joint Venture. The result of the Joint Venture negotiations, as it pertains to health care coverage for Kaiser retirees working for the Joint Venture, was the option of "opting out" of the Joint Venture medical plan in favor of the free Kaiser Retiree Medical Plan – which many Joint Venture Kaiser retired employees did.

In 1998, mid-term of the new first time Joint Venture Labor Agreement, the Joint Venture approached the Union with the interest of early contract negotiations. In August of 1998, the parties reached their second Joint Venture Labor Agreement. Sometime after the 1998 negotiations, Accuride announced that they had bought out Kaiser's partnership in the Joint Venture, reducing the parties to the current Labor Agreement between Accuride and the UAW only.

*Time limits.* The instant grievance (JX 2) was reduced to writing on February 16, 2001 by the Union and answered by the Company that same day, all of which is in accordance with the time limits of Article 4, Section B, Step 2. The Company's answer in Step 2 is as follows: "Policy issue  Refer to Step 3 of grievance procedure".

The parties were very specific when they negotiated the language. The parties intended that a grievance, once filed, would process within specific time limits. Following the time limits set forth in Article 4, Section B, Step 3 and the date in which the grievance was reduced to writing and answered by the Company, per JX 2, if the time limits were stretched by the Company to its limits, the Union should have received a written disposition of the grievance in mid-March 2001.

Approximately three months later and after several requests from the Local Union President, Doug Ferguson, for a written disposition to the griev-ance, Human Resource Manager, Kenna Ogasawara, answered the grievance in writing (JX 3) that management, did not want to submit a response and was waiting for Bob Nida, who was stationed in Mexico and/or Pat Wolfe to resolve the instant grievance. Five days after Human Resource Manager Kenna Ogasawara passed the responsibility to respond to the grievance to Bob Nida and Pat Wolfe, Bob Nida, via E-Mail (CX 2, dated June 18, 2001), apologized for his late reply. Mr. Nida further went on to state in his letter of June 18, 2001, that he hoped his response would allow the parties to move quickly forward in the grievance procedure to achieve resolution.

The Union would like to draw the Arbitrator's attention to the transcript, at 113-114:

**Q.** Bob, do you recall the first time you became aware that Joint Exhibit 2 had been submitted?

**A.** The exact day and the exact method, I can't recall. However, I am sure it was fairly early after the grievance had been filed.

**Q.** How would you have become aware of joint 2?

**A.** Probably by telephone call from Kenna. Because of my involvement with AKW in years past. And because of my labor relations background, I was her mentor and tutor, you might say, in this arena in helping her get acclimated to properly represent the company and to properly deal with the union and the employees at the plant. So I am sure Kenna gave me a phone call.

**Q.** Did you discuss the grievance with Kenna?

**A.** There were a number of conversations over a period of time with Kenna about the issue. There was also time during those weeks where I did my own research about the issue and looked backwards in to the grievance rather than just giving an off the top of my head answer.

**Q.** And did you have any communications with the union about the grievance?

**A.** As Doug referenced numerous conversations on SPDs and health insurance and pension and 401K plans, I am sure during that time there was some discussion. But I can't recall a specific conversation. I think I clearly understood what the issue was from a union point of view. So I am sure there were. But I can't recall a specific issue – I mean, date.

Based upon Mr. Nida's testimony, he and Kenna Ogasawara were very aware of the grievance. As stated by Mr. Nida, page 113, lines 21 and 22 of the transcript, "There were a number of conversations over a period of time with Kenna about the issue."

Turning to the Third Step Grievance disposition (JX 3), Kenna Ogasawara, who by Mr. Nida's testimony had a number of conversations with Mr. Nida about this issue, answers the grievance by stating that management does not want to submit a response and then passes the buck to Mr. Nida to deal with the issue when in fact Mr. Nida was dealing with it all along with Kenna Ogasawara.

Four months after Mr. Nida first became aware of JX 2, he sent a letter to President Doug Ferguson apologizing for his lateness and now wanted to move quickly. If the Company had followed the time limits set forth in Step 3 of the Grievance Procedure, ten working days after the Step 3 meeting, the Union should have received the Company's written disposition. The Company had dragged its feet for approximately three months after the Step 3 meeting and by its letter of June 18, 2001, is trying to act as though they had a general interest in moving the grievance quickly forward through the grievance procedure. The Company obviously violated the time limits set forth by the parties in Article 4, Section B, Step 3 of the Grievance Procedure.

Article 4, Section C, para. 2, addresses the issue of the failure to process a grievance within the time limits set forth and states that such a failure would be deemed to be a waiver of the grievance. The parties to this Agreement collectively negotiated expressed provisions for granting grievances by default. The Company, as in this case, failed to answer or take other required action within a contractually stated time. According to Article 4, Section C, para. 2, based on the violation of time limits, the grievance in this case, is to be sustained in favor of the Union.

During the 1997 contract negotiations, the parties discussed the grievance procedure and agreed to the Letter of Understanding on page 69 of the Agreement. It was re-affirmed in the 1998 negotiations. It states:

> During the 1997 negotiations, the matter of the grievance procedure was discussed. It was agreed that both parties would, in good faith, do their respective part in order to expedite all grievances through the accepted steps of the procedure. Company-paid bi-weekly meetings will be held for this purpose unless otherwise mutually agreed. The discussion and resolution of grievance shall be the subject of these meetings, along with other matters that the parties may deem appropriate to raise for discussion. These meetings will be short if there are not a significant number of matters to be addressed, and the meetings may be canceled upon mutual consent.
>
> Agreed and accepted as of this 18th day of August 1998.

*Discussion and findings.* The Union argues that when they first entered into contract negotiations with the Joint Venture, they were negotiating with the two owners, Accuride and Kaiser. This is also true for the 1998 negotiations. This is verified per Mr. Nida's testimony (Tr 126):

Q. So during the 1998 negotiations, you were representing the joint venture during the negotiations?

A. Yes. It is a play on words. I was representing AKW, which happened to have two owners.

In the 1997 contract negotiations and then again in the 1998 contract negotiations, the Union was negotiating with the premise/understanding that they were negotiating with both owners, Accuride and Kaiser. With that understanding, agreements were reached based upon who the owners were at the time. Although Accuride and Kaiser are equally shared owners to an entity, at the time of contract negotiations with the Union, specifically in 1997, each owner to the Agreement, specifically Kaiser, needed some special dispensation. The Union, knowing Kaiser as an equal partner to the Joint Venture and a party to the Agreement forthcoming, granted Kaiser's concern in the area of health care by agreeing to the Letter of Understanding on page 108 of the Agreement on the issue of "opting out/opting down" in the 1997 contract negotiations. The Letter of Understanding was agreed upon specifically for Kaiser who, as of April 1999, is no longer a partner/owner of the Joint Venture.

According to Mr. Nida's testimony (Tr 130), there is no longer a joint venture between AKW and Kaiser. It just has different owners.

Q. So for clarification, is there a joint venture today between AKW and Kaiser?

A. No. But there is an AKW that was and still exists as it did then. Just has different owners.

When the Union negotiated the 1997 and 1998 Labor Agreements, they were negotiating with the owners, Accuride and Kaiser. Agreements were reached based upon the needs of Accuride and Kaiser. Kaiser's needs were addressed in the Letter of Understanding of "opting out/opting down", because Kaiser, as an owner of the joint venture and a party to the Labor Agreement, did not want to pay twice for health care coverage for Kaiser retirees working at the joint venture. The Union accepted the "opting out/opting down" language based on this premise.

As Mr. Nida testified, above, there are now different owners. Kaiser now is in no need of the "opting out/opting down" language. Kaiser, no longer a party to the joint venture or to the Agreement, is only responsible for retired Kaiser employees and not responsible for Kaiser retirees working at AKW.

145

At the arbitration hearing, the Company presented a document (CX 6) which was identified by the Company as a billing to AKW for Kaiser retirees working at AKW. There is nothing in the Labor Agreement on billing issues and whatever agreement Accuride and Kaiser may have had is between them and not the Union. The Union can only deal with matters that were negotiated and placed in writing in the Agreement (JX 1). Accuride and Kaiser entered into their own negotiations on this matter without the Union's involvement or participation. The Company cannot hold the Union hostage to the agreement reached by Accuride and Kaiser.

Accuride and Kaiser entered into their own negotiations over the cost and billing of health care coverage for Kaiser retirees working at AKW. Kaiser, who no longer is a party to the joint venture or the Agreement, is in bankruptcy. If Kaiser is solely responsible for Kaiser retiree health care coverage for those working at AKW because of the "opting out/opting down" language and if Kaiser is no longer a party to the Agreement, who will provide health care coverage for Kaiser retirees working at AKW?

According to Article 16, the Company will provide group insurance benefits and according to Article 20, Section F, in part: "All provisions of this agreement shall apply alike (equally) to all male and female employees".

*Conclusion.* The parties, when negotiating the Agreement, specifically Article 4, were very specific. For example,

- In Section A, both the Company and the Union shall have Article 4 available to them to provide for the presentation and equitable adjustments of grievances.

- In Step 1, the supervisor shall give an answer within twenty-four hours.

- In Step 2, specific time limits were negotiated to move the grievance forward with the grievance answer in writing. There is nothing in Step 2 that states if the Union doesn't received the answer in the specified time limits that the grievance automatically moves to the next step of the Procedure.

- In Step 3, once again the parties negotiated very specific time limits including that the Union would receive a written disposition within ten working days following the final Step 3 meeting.

- The parties, during contract talks, very specifically negotiated procedures, time limits, when a grievance was reduced to writing, when they would receive a written answer and a written disposition to the grievance.

- The parties addressed their concerns of the Grievance Procedure by adopting a Letter of Understanding on page 69 of the Labor Agreement.

- The parties, after finalizing the specific process of the Grievance Procedure, collectively negotiated what would happen if those time limits were not followed. This is addressed in Article 4, Section C, paragraph 2 which states in part: "<u>Failure by either party</u> to process a grievance within the time limits set forth will be deemed to be a **waiver of the grievance.**"

There is no one-sided default clause. If the Union does not process their grievance within the specified time limits of the Grievance steps, the grievance is waived by default. The Company would expect strict enforcement of the language. There is no "automatic" processing to the next step if the Company fails to provide answers in a timely manner. The parties negotiated express provisions for granting grievances by default if the Company fails to answer within a specified time limit and the Union is respectfully requests the language of the Labor Agreement be strictly enforced. Article 4, Section C, paragraph 2 not only holds the Union in check, but also the Company.

The Union, in researching the issues of "time limits" and "grievances by default" respectfully requests the Arbitrator to consider the following:

- *Weyerhaeuser Co. and International Woodworkers of America, Local 5-15*, 90 LA 870, 872, (1988), (Arbitrator A. Dale Allen Jr.)

- *City of Cedar Rapids, Iowa and American Federation Of State, County And Municipal Employees, Local 620*, 81 LA 149, 155, 156, (1983) (Arbitrator Raymond R. Roberts).

- *ABEX Corp., Denison Div. And Int'l. Assoc. of Machinists and Aerospace Workers, Local 427*, 74 LA 137, 140, 141, (1980), (Arbitrator Marvin J. Feldman).

- *Shattuck Chem. Co. and Oil, Chem. and Atomic Workers Int'l. Union, Local 2-477*, 69 LA 912-916, (1977), (Arbitrator Jack F. Culley).

147

- *Rockwell Mfg. Co., Pittsburgh Equitable Meter Div. and United Automobile, Aerospace and Agricultural Implement Workers of America, Local 833*, 25 LA 534, 537, 538 (1959), (Arbitrator Clair V. Duff).

- *Globe-Wernicke Co. and Allied Ind. Workers, Local 382*, 33 LA 553, 555, 556, (1986), (Arbitrator Paul H. Sanders).

- *Dept. of Health and Social Services, Div of Economic Ser., State of Del. and American Federation of State, County and Municipal Employees Council 81, Locals 1832 and 2030*, 87 LA 563, 567, 568 (Arbitrator Thomas J. DiLauro).

Based upon the evidence and testimony of the Union and the pertinent contract language of this case and its bargaining history, the Union respectfully requests the grievance be found in favor of the Union.


## Position of the Company

The following is the arbitrator's summary of the argument presented by the Company in its post-hearing brief.

*Introduction.* The determinative facts are uncontested. The parties negotiated in good faith a rational coordination of benefits agreement that empowered eligible individuals to make a one-time election between Kaiser retiree medical benefits and AKW medical benefits for active employees. The purpose of the coordination of benefits agreement was to avoid the cost associated with duplicate coverage. The grievant in this case was informed of his choices, he elected to receive Kaiser retiree medical benefits, he opted out of AKW medical benefits for active employees, his decision was informed and it was voluntary. The grievant since making his election has continued to receive uninterrupted Kaiser retiree medical benefit coverage at no expense to him.

The Union does not argue that the coordination of benefits agreement is ambiguous, or that the grievant's election was invalid. The grievant did not testify or even appear at the arbitration hearing. The Union simply claims that it was surprised that Kaiser denied coverage for the grievant's dependent. The Union also claims it was surprised by developments in Kaiser's rumored finan-

148

cial status and fears that Kaiser could possibly breach at some future time its agreement to provide retirees medical benefits. As a result, the Union appears to suggest the arbitrator should usurp the bargaining process and revise the coordination of benefits agreement in a manner that, in hindsight and within the close confines of this case, appears more desirable than the manner in which it originally was made. Alternatively, the Union claims that Accuride's acquisition of all the interests in AKW roughly two years after the coordination of benefits agreement was entered somehow renders it unenforceable. The coordination of benefits agreement, however, is enforceable. It is rational and eminently clear. Whatever dispute the grievant has with Kaiser is not a subject of this arbitration. The grievance should be denied.

*The parties.* AKW, LP is a limited partnership that was owned at the time of its formation by Kaiser Aluminum & Chemical Corporation ("Kaiser") and Accuride Corporation ("Accuride"). Tr 98, 134. Kaiser is a publicly traded corporation engaged in the manufacture of aluminum products which operated a manufacturing plant in Erie, Pennsylvania (the "Erie Plant") prior to May 1997. Tr 100. Accuride is a manufacturer of steel and aluminum wheels for the heavy trucking and trailer industry. Tr 96. AKW acquired and began to operate the Erie Plant in May 1997. Tr 100, 134. The separate and independent status of AKW as a stand alone legal entity has been recognized by the National Labor Relations Board and by a federal court, both of which specifically rejected the argument that AKW was merely the alter ego of either Kaiser or Accuride. Tr 105-106, 127.

In April 1999, Accuride acquired all interests in AKW. AKW continues to operate the Erie Plant. Tr 98-99. There has been no change in the legal status of AKW. Tr 98. Hourly employees at the Erie Plant have been represented at all relevant times by UAW Local 1186 (the "Union"). Tr 100.

*Coordination of benefits agreement.* Negotiations between representatives of AKW and the Union occurred in January through March of 1997 and agreement was achieved on terms for an initial collective bargaining agreement in April. Tr 45, 101, 135. Negotiations were described as attenuated. Union President Doug Ferguson testified that the Agreement (JX 1), was "almost identical" to the collective bargaining agreement between the Union and Kaiser. Tr. 20. The AKW agreement "mirrored" the Kaiser agreement. Tr. 77. Employees voting on ratification were informed that the collective bargaining

149

agreement with AKW "contains provisions that are generally the same as those set forth in the UAW-Kaiser agreement." (UX 2)

Among the substantive issues addressed during the negotiations was the transition of Kaiser employees who were retirement eligible to active employment with AKW. Tr 103, 135. Ferguson testified that in view of the fact that AKW was a "stand on its own company," he took the position during the negotiations that there was nothing preventing eligible individuals transitioning to employment with AKW from applying for retirement benefits as part of their separation from Kaiser. Tr 24-25. AKW's representatives initially proposed that such individuals receive AKW medical benefits and forego, during their employment with AKW, Kaiser retiree medical benefits. Tr 48, 136. The Union responded that Kaiser retirees should maintain their eligibility for Kaiser retiree medical benefits, which required no monthly contributions. Tr 26-27, 49, 136.

The parties reached the coordination of benefits agreement as a compromise to enable eligible individuals, rather than the Union or AKW, to choose the coverage they preferred. Tr 50, 103-104. As Ferguson testified, the purpose of the coordination of benefits agreement was to prevent the duplication of costs that would be associated with duplicate coverage. Tr 26-27, 50-51. The Agreement was ratified unanimously by employees on April 13, 1997. Tr 66, 137. A Ratification Meeting Summary was distributed to all employees before the ratification vote occurred. Tr 65. The Summary described the right to make an election and the appropriate process established in the coordination of benefits agreement in pertinent part as follows (UX 2, p 9):

    (1)  Kaiser retirees hired by AKW as startup/substitute startup employees, who . . .

    (2)  Retire from Kaiser by September 15, 1997 . . .

    (3)  Can make a one-time irrevocable election – at time of retirement from Kaiser – to elect either Kaiser retiree medical/life insurance OR AKW medical/life insurance (election applies to themselves and dependents)

    (4)  Resulting treatment of medical/life insurance by Kaiser or AKW varies:

        a.  Electing Kaiser Retiree Coverage. If the retiree elects Kaiser retiree insurance for themselves and dependents, they will participate in Kaiser insurance and will not have future AKW insurance.

150

The coordination of benefits agreement was reduced to writing and signed. Tr 51. The letter memorializing the coordination of benefits agreement states in pertinent part as follows (JX 1, pp 108-109):

> Startup Kaiser Retirees will be permitted to "opt out" of AKW medical/life insurance by making an irrevocable, one-time voluntary election, at the time they retire from Kaiser on or before September 15, 1997, to elect Kaiser retiree medical and life insurance coverage for themselves and any dependents in lieu of any AKW medical and life insurance coverage.

*Grievant's election.* AKW communicated about the election of medical benefits under the coordination of benefits agreement in a memorandum that was distributed in May 1997. The memorandum provided in pertinent part (CX 5, emphasis in original):

> Kaiser Retiree Medical/Life Insurance and One-Time AKW "Opting Out" Election
>
> If you are an eligible AKW startup (or substitute startup) employee who retires by September 15, 1997 under the Kaiser hourly pension plan, the following provisions govern your health and life insurance options for yourself and your dependents:
>
> Opting Out of AKW Insurance in Favor of Kaiser Retiree Insurance. If you satisfy the above requirements, you will be permitted to "opt out" of AKW medical/life insurance by making an irrevocable, one-time voluntary election at the time you retiree from Kaiser on or before September 15, 1997. If you exercise this option, you will be electing Kaiser retiree medical and life insurance coverage for yourself and any dependents instead of any AKW medical and life insurance coverage. *You must understand this option will be permanent and irrevocable. If you elect Kaiser retiree medical and life insurance coverage, you and your dependents will not be covered at any future time by any AKW medical and life insurance....*
>
> IMPORTANT NOTE: *....When you decide to make any election, you are responsible for understanding the relevant plans and the permanent irrevocable nature of your election notwithstanding potential future changes or developments.*

Approximately 30 Kaiser retirees went to work for AKW. Tr 27. Each and every AKW employee who retired from Kaiser before September 15, 1997 elected either Kaiser retiree medical benefits or AKW active employee benefits, but not both. Tr 28. Many Kaiser retirees, like Ferguson, elected to receive the Kaiser retiree medical benefits to the exclusion of AKW active

- 17 -

151

employee benefits because the Kaiser benefits were contribution free. Tr 27-28, 51. Not all Kaiser retirees, however, elected Kaiser retiree medical benefits. For instance, Kaiser retiree Thomas Duda elected to receive AKW medical benefits. Tr 55-56.

Joe Matczak retired from employment with Kaiser on April 30, 1997 (CX 1). At the time he retired, Matczak elected to receive Kaiser retiree medical benefits. Tr 113. As Ferguson testified, he took "the one time option to take the Kaiser insurance." Tr 30. At all relevant times, Matczak has received Kaiser retiree medical benefits. Tr 111 (CX 1). Pursuant to an agreement between AKW and Kaiser, AKW has reimbursed Kaiser for the cost of the retiree medical benefits for its active employees including Matczak. Tr 140 (CX 6). Kaiser charges AKW monthly premiums for retirees under its "Keystone" plan as illustrated in Co. Exh. 6. With one exception, Kaiser's monthly premium is either $383.06 or $182.97 per month for each retiree. The monthly premium for one Kaiser retiree, Gary Wilson, is $554.26.

*Processing of the grievance.* The Union submitted the grievance about February 16, 2001 after Matczak informed Ferguson that Kaiser had recently denied coverage to his spouse. Tr 30-32. Ferguson initially told Matczak that Kaiser would have to provide coverage under its health plan. Tr 31 (UX 1). The plan document that Ferguson claimed he reviewed, Tr 31, was a plan applicable to active Kaiser employees (UX 1). That plan provides that retiree benefits are governed by a separate document (UX 1, p. 45). There is no evidence in the record whether an appeal of the benefits denial was submitted or whether any legal action was taken to pursue benefits from Kaiser.

The Union did not offer any competent evidence regarding Matczak's claim for benefits for his spouse, Kaiser's alleged denial of that claim, or Matczak's appeal or other legal action disputing the denial. The only evidence in the record concerning coverage under Kaiser's plan is an excerpt of the Retired Employees' Group Insurance Program for Retired Employees and Pensioned Surviving Spouses of Kaiser Aluminum & Chemical Corporation. Kaiser's plan provides in pertinent part that "Benefits under the Comprehensive Medical Expense and the Prescription Drug portions of the Program are provided for eligible dependents on the same basis as your own." In addition, the plan defines an eligible dependent as "the retired employee's spouse." (CX 3). The Union argued at the hearing that Kaiser should have covered the grievant's wife. Tr 31-32. However, the Union did not explain why Matczak

and his representatives have not pursued benefits from Kaiser in spite of the legal options available to them under ERISA. The Union apparently decided that if Kaiser would not provide coverage, it would be easier to attempt to compel AKW to do so by filing the grievance. Tr. 32-33.

The grievance contends that Matczak and his spouse were improperly denied AKW medical benefits. AKW determined that Matczak and his spouse's coverage status was the result of his election to receive Kaiser retiree medical benefits and opt out of AKW medical benefits. Tr 144. AKW's medical insurance provides coverage only for employees who are subscribers and the dependents of subscribers. Tr. 143-144. This requirement is identical to the requirement that existed under Kaiser's medical plan for active employees, which provides that "Benefits under the medical . . . portions of the Program are provided for eligible dependents on the same basis as your own." (UX 1, p. 41.) As a result, that exclusion was negotiated by the Union during the 1997 negotiations.

The parties discussed the grievance on several occasions and exchanged a number of telephone calls about it. Tr 36-38. Former AKW Director of Human Resources, Bob Nida, prepared the Step 3 answer to the grievance. Tr 115. There, Nida explained that because Matczak "chose to opt out [of AKW medical insurance] so he could obtain Kaiser retiree coverage," he could not complain about the consequences of his choice. The grievance sought not to remedy any discrimination against Matczak but to undue the collectively bargained agreement between AKW and the Union by creating a special exception for him. The grievance therefore was denied. (CX 2)

An arbitration hearing was scheduled for April 4, 2002. Prior to the hearing, Union representative Joe Orlando contacted Nida and the two discussed the parties' positions with respect to the grievance. Orlando found the Company's position persuasive and requested that Nida provide additional information in writing. Tr 117. Nida provided documents and a position statement to Orlando both via facsimile transmission and express mail to ensure their prompt receipt (CX 3). On March 6, Orlando indefinitely postponed the arbitration hearing (CX 4). Thereafter, the Union neither withdrew the grievance nor contacted the Company to reschedule the arbitration hearing. Therefore, in August, the Company requested to reschedule the hearing to obtain a final determination with respect to the grievance. Tr 123.

153

*Argument.  Grievant's election to receive Kaiser retiree medical benefits is enforceable and excludes him from AKW medical benefits.*  It is fundamental that the burden is on the Union to establish a breach of the parties' Agreement to sustain its grievance.  However, the Union in this case is seeking not to enforce the parties' coordination of benefits agreement, but to avoid it.  The coordination of benefits agreement unequivocally authorizes eligible individuals "to elect Kaiser retiree medical and life insurance coverage for themselves and any dependents in lieu of any AKW medical and life insurance coverage."  The coordination of benefits agreement further provides that the election will be a "one-time voluntary election" made "at the time they retire from Kaiser on or before September 15, 1997," and that the election shall be "irrevocable."  The Union's bargaining committee accepted the coordination of benefits agreement, the employees unanimously ratified it after reviewing a comprehensive Ratification Summary, and the parties reduced the coordination of benefits agreement to writing.  The grievant had notice of his election and he received instructions regarding the importance of the election and the manner of making it.  Pursuant to those instructions and consistent with the coordination of benefits agreement, the grievant made a voluntary and informed election of Kaiser retiree medical benefits and opted out of AKW medical benefits for active employees.  Here, in addition to the unanimous ratification vote, AKW accurately communicated with the grievant about his rights and obligations under the Agreement.  That communication cautioned the grievant to familiarize himself with his choices and to make his election with care.  Since that time, the grievant has received uninterrupted Kaiser retiree medical benefits in accordance with his election.

There is no justification for changing the grievant's election and undoing the negotiations that resulted in the coordination of benefits agreement.  Enforcing the election as required by the coordination of benefits agreement in no way conflicts with any other provision in the parties' collective bargaining Agreement.  While the collective bargaining Agreement provides generally for benefits for AKW employees, no provision touches upon the coordination of benefits for Kaiser retirees transitioning to employment with AKW.  The coordination of benefits agreement is the exclusive authority controlling the precise transitional issue raised by the duplication of medical benefits for a subset of employees who were eligible for Kaiser retiree medical benefits at the time they became AKW employees.  Application of the coordination of benefits agreement is entirely consistent with the settled maxim that specific

154

governs general language when construing a labor agreement. Application of the coordination of benefits agreement also is consistent with the parties' expressed intention to provide for coordination of benefits and avoid the cost associated with duplicate benefits. And application of the coordination of benefits agreement is consistent with the design of the collectively bargained agreements achieved in 1997, which contain special provisions for transitional issues while mirroring the terms and conditions of employment in the Kaiser agreement as a general matter.

Nor do the Union's expressions of regret over the coordination of benefits agreement justify vacating it. The parties chose in the coordination of benefits agreement to allow Kaiser retirees to make an important judgment regarding their future medical benefits. These retirees were employed for many years by Kaiser; they were familiar with Kaiser and its benefit plans; they were familiar with the Erie Plant; and they were aware that AKW was acquiring the Erie Plant and would become their new employer. Kaiser retirees are continuing to receive the medical benefits they were promised. The fact that the Union, or AKW, might have negotiated a different agreement with the benefit of hindsight does not by any means warrant the immeasurable damage to the parties' bargaining relationship that would be inflicted by undoing the coordination of benefits agreement. The Union's request for relief in the grievance goes well beyond the legitimate scope of arbitration and should be rejected. In *Lorillard*, 87 Lab. Arb. (BNA) 507 (1986), Arbitrator Chalfie stated, at 512,

> [The arbitrator's] function is not to rewrite that coordination of benefits agreement and certainly it is not to suggest, imply nor to inform the Parties of what changes should be effected, renegotiated or changed even if his sense of justice and fairness so dictate, or even if he believes the coordination of benefits agreement contains inequities.... The Arbitrator's Award...must derive its essence from the coordination of benefits agreement, and...tell the Parties what they can or cannot do inside of that coordination of benefits agreement.

*The parties to the Agreement have not changed.* The parties to the Agreement are AKW and UAW Local 1186. There has been no change to AKW as a legal entity. The Union's argument has no merit. The coordination of benefits agreement should be enforced.

*Conclusion.* For all of the foregoing reasons, the grievance should be denied. With respect to the subject of a potential remedy in the event the

155

Arbitrator does not deny the grievance in full, the grievance seeks benefits on behalf of the grievant and his dependents only. It is unimaginable how AKW could comply with an award of AKW medical benefits notwithstanding the grievant's election to opt out of such benefits without creating discrimination against the other individuals who also elected and have been receiving Kaiser retiree medical benefits. In addition, it is unimaginable how AKW and Kaiser could determine whether Kaiser or AKW insurance is liable for the individual claims that have undoubtedly been paid by Kaiser's plan over a period of almost seven years. Therefore, if the Arbitrator does not deny the grievance in full, the Company requests that the Arbitrator retain jurisdiction to resolve the serious remedial issues that inevitably will arise.

## Discussion

At the hearing, the parties agreed that the arbitrator should frame the issue(s) on the basis of the record as a whole. Accordingly, the issues are as follows:

1. Did the Company violate Article 4, Section B, Step 3, as it pertains to "time limits" by not answering the grievance within the negotiated time limits? If so, what is the appropriate remedy?

2. Did the company violate any provision of the Agreement when it refused to enroll grievant in the AKW employee benefit plan? If so, what is the appropriate remedy?

*Did the Company "waive" the grievance, i.e., grant it by default, by failing to make a written disposition of it within the negotiated time limit?* The Union asserts that by its failure to respond within the time limits specified in the grievance procedure at Article 4, Section B, Step 3, the Company effectively granted the grievance by default. This issue must be resolved first by the arbitrator since a finding that the Company has granted the grievance by default would clearly obviate the need for any consideration of the merits.

As the Union notes in its brief, there is no dispute that the grievance was properly processed through Step 2. The grievance form (JX 2) shows that the written grievance was filed on February 16, 2001, and that the Department Head, Robert Lindsey, responded on the same day. The grievance form also indicates that the grievance was appealed to Step 3, but there is no concrete

156

evidence of the date on which that occurred. Local President, Douglas Ferguson, testified that the local union recognized that the Company's industrial relations representative at the Erie plant, Kenna Ogasawara, was new to the job and that she needed to consult with corporate staff on the issues (Tr 35-36).

> [She] had always talked to the corporate people, which was mostly Pat Wolfe and Bob Nida. And we gave her ample time to pose the question back and forth to Pat Wolfe and Bob Nida.
>
> We participated in quite a few conference calls back and forth trying to tie up loose ends on the pension, the insurance and some of the other issues we had. And we also at that particular time talked about some of these – two grievances – one on the pension and one on the insurance.
>
> *We never did get an answer through that process. So that is when we referred it to Step 3. We discussed it in meetings. And finally we told Kenna that we can't delay it any longer.* That we have people out there that we are representing that we have to have an answer on that grievance. And the answer she gave us, as you can read the Company position, really isn't an answer. [See JX 3.] She kind of left it up to Pat Wolfe and Bob Nida. [Emphasis added here.]

Based on this testimony of Mr. Ferguson, it is apparent that after the Step 2 response from Mr. Lindsey, but *before* the Union actually appealed to Step 3, there were conference calls wherein the instant grievance was discussed with Mr. Nida, Ms. Wolfe, or both. Thus, over a period of time, the parties engaged in discussions about the matter. It is unclear, however, what the length of that period was. At some point, the Union became dissatisfied with the progress that was being made. Mr. Ferguson testified, "We never did get an answer through that process. So that is when we referred it to Step 3."

Unfortunately, there is no evidence in the record to show when that occurred. Since the Agreement allows for an extension of time limits by mutual agreement in Article 4, Section C, paragraph 2, the length of time between the Company's Step 2 answer and the Union's appeal to Step 3 is unknown. Mr. Ferguson's testimony does not provide any firm date on which the referral was made to Step 3.

Moreover, the Agreement provides that after referral to Step 3, the parties are to engage in meetings with respect to a grievance. Mr. Ferguson's testimony refers to such meetings. "We discussed it in meetings. And finally we told Kenna that we can't delay it any longer." Mr. Ferguson gave no

157

indication of how many meetings might have occurred or when they occurred. Again, it is possible, even likely, that the Union agreed, tacitly if not overtly, to delay the due date of the Company's response in the hope of achieving a satisfactory settlement of the grievance.

The time limit language at issue states:

> **Step 3** – If the grievance is not satisfactorily solved in Step 2 above, then prior to the expiration of five (5) working days from the date the grievance was returned by the Company to the Union representative, in compliance with Step 2 above, the Union may notify the Employee Relations Department in writing of appeal to Step 3. *Such grievance shall then be discussed at a meeting or meetings to be held by the Union and the Employee Relations Department within ten (10) working days after the date of notice of appeal and a written disposition made thereof within ten (10) working days following the final Step 3 meeting.* [Emphasis added here.]

Based on the highlighted contract language above, the Company had ten working days following the *final Step 3 meeting* to provide its written disposition of the grievance. There can be no question that the Company did provide its "written disposition". Even if Kenna Ogasawara's answer of June 13 (JX 3) is not interpreted to be the final disposition required by the Agreement, certainly Robert Nida's letter of June 18 was. He states,

> The Matzcak (sic) grievance alleges that AKW is not in compliance with the CBA by not allowing dependent coverage under the terms of the insurance plan.

> The facts in this case do not justify such coverage since Joe himself is not covered, and therefore no dependents can possibly be enrolled. Joe accepted the one time offer to opt in or opt out of AKW health insurance, and he chose to opt out so he could obtain Kaiser retiree coverage. This was his choice.

> The Company cannot go back in time to allow him the opportunity to change his mind now that his life circumstances have changed. This provision was a part of the collective bargaining process and now Joe cannot undo what impacts his personal situation and many potential others as well. *For the above reasons, the Joe Matzcak (sic) grievance remedy as requested is denied.* [Emphasis added here.]

The question for the arbitrator is whether this response came within ten days following the "final step 3 meeting"?

158

The Union relies on the lapse of about four months, from Mr. Lindsey's Step 2 response on behalf of the Company until Mr. Nida's written disposition on June 18, to claim that the Company violated the Agreement's time lines. Based on the above analysis, the arbitrator is not persuaded. First, as noted above, there is no firm evidence about when the Union actually appealed to Step 3. It could not have been immediately after the Step 2 response of Mr. Lindsey because Mr. Ferguson testified that there were meetings and conference calls for some period of time before the Step 3 appeal was entered.

Moreover, although the time limit language in the quoted portion of the Agreement above requires all Step 3 meetings to occur within ten working days after the Union notifies the Company of its appeal to Step 3, by mutual agreement (as provided in Section C, paragraph 2), the parties may agree to extend any deadlines. If the Union did agree to extend the deadline, even if only implicitly, the Company's delay in responding may not have violated the Agreement.

The arbitrator has no doubt, based on Mr. Ferguson's testimony, that there did come a time when the Union demanded a written disposition of the matter from the Company. Clearly, at that point, any agreement to extend the deadline ended and such demand represented the "final step 3 meeting" on the grievance. Within ten days from such demand, the Company was obligated to provide a written disposition as required by the contract. Failure to do so would arguably lead to a finding that the Company had granted the grievance by default. Unfortunately, there is no evidence of the exact date when Mr. Ferguson or other authorized Union representative actually made the demand for an answer.

In such light, there is nothing to prove to the arbitrator that Kenna Ogasawara's written response, or for that matter, Robert Nida's letter of June 18, did not come within ten days of such demand. Here, as always, the burden of proof is on the party asserting a claim. Although it is clear that both the Ogasawara and Nida responses came almost four months after the Step 2 denial of the grievance by Mr. Lindsey, Lindsey's response is not the triggering event for the tolling of the time limit. Such triggering event is the "final Step 3 meeting" and no evidence establishes when such meeting occurred. Thus the Union has not proven that the Company's response was not within the ten working day time limit set forth in Article 4, Section B, Step 3, so the Union's claim that the Company violated Article 4, Section B, Step 3, must be denied.

159

*Did the company violate any provision of the Agreement when it refused to enroll grievant or his wife in the AKW employee benefit plan?*
Turning to the merits of this case, the logic of the Union's argument is plain. So long as Kaiser was a part owner of AKW, it made sense, and the Union agreed that Kaiser retirees who were actively employed at AKW would be required to opt either for Kaiser or AKW health insurance. They could not be covered by both. Once Kaiser was no longer a part owner of AKW, however, the rationale prohibiting double coverage ended, in the Union's view, and AKW was obligated to provide the same benefits for all its employees regardless of whether they were Kaiser retirees or not.

At the hearing and in their briefs, the parties focused a good deal of attention on the question of who the parties to the Agreement were and are. The Union seems to believe that AKW was simply a short hand designation for two distinct parties – Kaiser and Accuride – both of whom the Union believes were parties to the Agreement. This is not the case, however. AKW is neither Kaiser nor Accuride but a "stand alone" company. Neither Kaiser nor Accuride were parties to the original labor agreement in 1997 or the 1998 Agreement here at issue.

Having reached the above conclusion, it is plain that the Company party to the Agreement has not changed at all since the initial bargaining agreement was reached in 1997. It is AKW. On the other hand, the logic (discussed above) that supported the Union's acceptance of the Letter of Agreement which pertained to the coordination of health benefits (pp 108-110 of the Agreement), has been substantially undermined by Kaiser's selling out of its interest in AKW. The fact that the reasons for what the parties negotiated have changed does not change the terms of the Agreement. The question before the arbitrator is limited to determining whether the Company's refusal to allow the grievant or his spouse to be covered under the Company's health insurance program violates the Agreement, as it was written in 1998.

On this point, the Union asserts that Article 16 requires the Company to provide group insurance to all members of the bargaining unit and Article 20, Section F, requires that all provisions of the Agreement be applied equally to all employees. Thus, it is the Union's view that the Company is obligated to see to it that all employees are covered by health insurance.

160

The arbitrator may not, however, disregard the Letter of Agreement at page 108 of the Agreement. Such Letter includes a special provision relating to Kaiser retirees who work for AKW and states:

> Startup *Kaiser Retirees will be permitted* to "opt out" of AKW medical/life insurance by making an irrevocable, one-time election, at the time they retire from Kaiser on or before September 15, 1997, *to elect Kaiser retiree medical and life insurance coverage for a themselves and any dependents in lieu of any AKW medical and life insurance* coverage. *If these individuals elect Kaiser retiree medical and life insurance coverage, they will not be covered at any future time by any AKW medical and life insurance.* [Emphasis added here.]

This language provides a specific exception to the general rule of Article 16 that all employees are to be covered by AKW health insurance. Elkouri and Elkouri, *How Arbitration Works,* Fourth Edition [BNA, 1985], p. 356 explain that where there is a conflict between specific and general language in an agreement, the specific will govern.

Here, there is no dispute that grievant opted out of the AKW insurance coverage and chose to be covered by Kaiser retiree insurance when he retired from Kaiser and moved to AKW employment. The above Letter unambiguously provides that such individuals "will not be covered at any future time by any AKW medical and life insurance." When grievant subsequently attempted to enroll in AKW insurance, the Company properly denied him that option pursuant to the Letter of Agreement.

At the conclusion of its brief, after noting that Kaiser is in bankruptcy, the Union asks, "If Kaiser is solely responsible for Kaiser retiree health care coverage for those working at AKW because of the 'opting out/opting down' language and if Kaiser is no longer a party to the Collective Bargaining Agreement, who will provide health care coverage for Kaiser retirees working at AKW?" Such is a reasonable question but not one for the arbitrator to answer. There is nothing in the Agreement that suggests that the parties mutually agreed to put such a question before a grievance arbitrator.

*    *    *

Having carefully considered all of the evidence and arguments presented by the parties in this matter, the arbitrator is compelled to conclude that the Union has not proven that the Company violated the Agreement either with

161

regard to the timeliness of its response at Step 3 of the grievance procedure or by refusing to afford health care coverage to the grievant and/or his wife. Accordingly, the grievance must be denied.

## AWARD

The grievance is denied.

_____
ARBITRATOR

Grand County, Colorado
September 26, 2003

162