

# AGREEMENT

*Between*



An Accuride / Kaiser Limited Partnership

and

**UNITED AUTOMOBILE, AEROSPACE
& AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,
and its Local 1186**

**AUGUST 18, 1998**

## 1997

## 1998

## 1999

## 2000

# Table of Contents

AGREEMENT ............................................................. 6
ARTICLE 1 — PURPOSE AND SCOPE ............................ 7
    Section A.   Coverage ................................................. 7
    Section B.   Recognition ............................................ 7
    Section C.   Direction of the Work Force ....................... 7
    Section D.   Legal Rights ........................................... 7
ARTICLE 2 — UNION SECURITY ................................... 8
    Section A. .............................................................. 8
    Section B. .............................................................. 8
ARTICLE 3 — CHECK-OFF .......................................... 8
    Section A.   Procedure .............................................. 8
    Section B.   Indemnity .............................................. 9
ARTICLE 4 — ADJUSTMENT OF GRIEVANCES ............... 9
    Section A.   Purpose ................................................ 9
    Section B.   Purpose ................................................ 9
    Section C.   General ................................................ 11
ARTICLE 5 — UNION REPRESENTATION ...................... 11
    Section A.   Shop Committee .................................... 11
    Section B.   Stewards ............................................. 12
    Section C.   Partial Operation .................................. 12
    Section D.   General ............................................... 12
ARTICLE 6 — DISCIPLINARY ACTION and DISCHARGE ... 12
    Section A.   Rules and Regulations ........................... 12
    Section B.   Discharge Procedure .............................. 12
    Section C.   Disciplinary Layoff ............................... 13
ARTICLE 7 — SENIORITY ......................................... 13
    Section A.   Purpose .............................................. 13
    Section B.   Definition of Terms ............................... 13
    Section C.   General Principles ................................ 14
    Section D.   Promotions .......................................... 14
    Section E.   Reduction in Force ................................ 15
    Section F.   Layoff and Recall ................................. 16
    Section G.   Loss of Seniority .................................. 16
    Section H.   Preferential Seniority ............................ 17
    Section I.   Seniority of Supervisors ......................... 18
    Section J.   Probationary Employees ......................... 19
    Section K.   Disabled Employees .............................. 19
    Section L.   Laid Off Employees ............................... 21
    Section M.   Temporary Layoff ................................ 21
    Section N.   Transfers ............................................ 21
    Section O.   Rules of Seniority Application ................. 22
    Section P.   Erosion of the Unit ............................... 23
ARTICLE 8 — TEMPORARY WORK ASSIGNMENT ........... 23
    Section A.   Purpose .............................................. 23
    Section B.   Procedure and Wages ............................ 23
    Section C. ............................................................ 24

ARTICLE 9 — HOURS OF WORK ............ 24
  Section A.  Purpose ............ 24
  Section B.  Normal Work Day and Work Week ..... 24
ARTICLE 10 — OVERTIME AND ALLOWED TIME ...... 25
  Section A.  Purpose ............ 25
  Section B.  Definitions ............ 26
  Section C.  Overtime Payment Conditions ...... 26
  Section D.  Allowed Time Payment Conditions ..... 27
  Section E.  Pay for Injury on the Job ...... 28
ARTICLE 11 — SHIFT PREMIUM ............ 28
  Section A.  Amount ............ 28
  Section B.  Application of Shift Premium ...... 29
ARTICLE 12 — WAGES ............ 29
  Section A.  Wages ............ 29
  Section B.  Cost-of-Living ............ 30
  Section C.  New and Changed Job Classification ... 31
ARTICLE 14 — HOLIDAYS ............ 32
  Section A.  Named Holidays and Conditions ..... 32
  Section B.  Holiday Pay Provisions ...... 33
ARTICLE 15 — VACATIONS ............ 33
  Section A.  Eligibility ............ 33
  Section B.  Length of Vacation ............ 34
  Section C.  Vacation Scheduling ............ 35
  Section D.  Reports ............ 36
  Section E.  Vacation Pay ............ 36
  Section F.  ............ 37
ARTICLE 16 — PENSION and GROUP INSURANCE BENEFITS ............ 37
ARTICLE 17 — LEAVES OF ABSENCE ............ 38
ARTICLE 18 — SAFETY ............ 38
  Section A.  Purpose ............ 38
  Section B.  Equipment ............ 39
  Section C.  Organization and Procedure ...... 39
  Section D.  Prescription Safety Glasses ...... 39
  Section E.  Gloves ............ 40
ARTICLE 19 — BULLETIN BOARDS ............ 40
  Section A.  Provisions and Usage ............ 40
ARTICLE 20 — GENERAL PROVISIONS ............ 41
  Section A.  Smoking ............ 41
  Section B.  Supervisors Working ............ 41
  Section C.  Plant Security ............ 41
  Section D.  Inventory ............ 42
  Section E.  Tardiness ............ 42
  Section F.  No Discrimination ............ 42
ARTICLE 21 — OTHER AGREEMENTS and MEMORANDA .. 43
  Section A.  Purpose ............ 43
  Section B.  Procedure ............ 43
ARTICLE 22 — STRIKES AND LOCKOUTS ............ 43
  Section A.  Purpose ............ 43
  Section B.  Undesirable Acts ............ 44

ARTICLE 23 — SUPPLEMENTAL UNEMPLOYMENT BENEFITS ............ 44
ARTICLE 24 — JURY AND WITNESS PAY ............ 44
ARTICLE 25 — BEREAVEMENT PAY ............ 44
ARTICLE 26 — PURPOSE, PRACTICES AND COOPERATION ............ 45
ARTICLE 27 — TERMINATION ............ 45
APPENDIX A - JOB CLASSIFICATIONS ............ 48
APPENDIX B - SKILLED TRADES AGREEMENT ..... 48
  SECTION 1 ............ 48
  SECTION 2 ............ 49
  SECTION 3 ............ 49
  SECTION 4 ............ 49
  SECTION 5 ............ 49
  SECTION 6 ............ 50
  SECTION 7 ............ 50
  SECTION 8 ............ 50
  SECTION 9 ............ 50
  SECTION 10 ............ 50
  LOCAL AGREEMENT ............ 50
APPENDIX C - AKW L.P. AGREEMENT CONCERNING TRANSITIONAL ISSUES ............ 51
LETTERS OF AGREEMENT
  (1)  Maintenance Training Programs ............ 66
  (2)  Grievance Procedure ............ 69
  (3)  Labor Disputes ............ 70
  (4)  Contracting Out ............ 71
  (5)  Impact of Sub-Contracting ............ 73
  (6)  Medical Disputes ............ 75
  (7)  Disciplinary Records ............ 76
  (8)  First Responders ............ 77
  (9)  Temporary Work Assignments ............ 78
  (10) Overtime Distribution ............ 79
  (11) Vacation Scheduling ............ 81
  (12) Vacation One-Day-At-A-Time ............ 83
  (13) Employee Health Assistance Plans ............ 85
  (14) Lost Time for Blood Donation ............ 86
  (15) Inventory Scheduling ............ 87
  (16) Vacation Replacement Bids ............ 88
  (17) Supervisor Working ............ 90
  (18) Trainee Bid Provision ............ 91
  (19) Team Leader Provision ............ 92
  (20) Team Leader Staffing Levels ............ 94
  (21) Medical Record Confidentiality ............ 95
  (22) Scheduling Issues ............ 96
  (23) Representation Protocols ............ 97
  (24) Weekend Team Leader Coverage ............ 98
  (25) Plant Seniority Applications of Millwright Trainees ............ 99
  (26) Policy Change on Holiday Pay/Vacation One-Day-At-A-Time ............ 100

(27) Day-At-A-Time Vacation for Sick Leave
Employees ............................................... 101
(28) Bid Posting and Loss of Bidding Rights ........... 102
(29) Family and Medical Leave ........................ 103
(30) Job Classifications ............................. 105
(31) Pension Cashouts ............................... 106
(32) Opting Out/Opting Down Issues and
AKW/Kaiser Insurance ................................ 108
(33) Benefit Plan Review ............................ 111
(34) "Hold Harmless" Clause ......................... 113
(35) Printing of Collective Bargaining Agreement ..... 114
(36) Temporary Employees ............................ 116
(37) Health Insurance ............................... 117
(38) Five-Year Vesting Waiver ....................... 118
(39) Pension Cash Out ............................... 119
(40) S&A Benefits ................................... 120
(41) Life Insurance ................................. 121
(42) Saw and Die Set-Up Maintenance ................. 122
(43) Impact of Suspensions .......................... 123
(44) Stores Withdrawal – Uncovered Shifts ........... 124
(45) Hydraulic Press ................................ 126
(46) Performance Pay ................................ 127

## Letters of Agreement

Maintenance Training Programs ........................ 66
Grievance Procedure .................................. 69
Labor Disputes ....................................... 70
Contracting Out ...................................... 71
Impact of Sub-Contracting ............................ 73
Medical Disputes ..................................... 75
Disciplinary Records ................................. 76
First Responders ..................................... 77
Temporary Work Assignments ........................... 78
Overtime Distribution ................................ 79
Vacation Scheduling .................................. 81
Vacation One-Day-At-A-Time ........................... 83
Employee Health Assistance Plans ..................... 85
Lost Time for Blood Donation ......................... 86
Inventory Scheduling ................................. 87
Vacation Replacement Bids ............................ 88
Supervisor Working ................................... 90
Trainee Bid Provision ................................ 91
Team Leader Provision ................................ 92
Team Leader Staffing Levels .......................... 94
Medical Record Confidentiality ....................... 95
Scheduling Issues .................................... 96
Representation Protocols ............................. 97
Weekend Team Leader Coverage ......................... 98
Plant Seniority Applications of Millwright Trainees .. 99
Policy Change on Holiday Pay/Vacation One-Day-At-A-Time 100
Day-At-A-Time Vacation for Sick Leave Employees ...... 101
Bid Posting and Loss of Bidding Rights ............... 102
Family and Medical Leave ............................. 103
Job Classifications .................................. 105
Pension Cashouts ..................................... 106
Opting Out/Opting Down Issues and AKW/Kaiser Insurance 108
Benefit Plan Review .................................. 111
"Hold Harmless" Clause ............................... 113
Printing of Collective Bargaining Agreement .......... 114
Temporary Employees .................................. 116
Health Insurance ..................................... 117
Five-Year Vesting Waiver ............................. 118
Pension Cash Out ..................................... 119
S&A Benefits ......................................... 120
Life Insurance ....................................... 121
Saw & Die Set-Up Maintenance ......................... 122
Impact of Suspensions ................................ 123
Store Withdrawal – Uncovered Shifts .................. 124
Hydraulic Press ...................................... 126
Performance Pay ...................................... 127
Performance Pay Example .............................. 128

099

**AGREEMENT**

"This Agreement, dated **August 18, 1998,** (hereinafter referred to as the or this "Agreement") is between **AKW L.P. or such other name as may be adopted by AKW L.P.** (hereinafter referred to as the "COMPANY" or "AKW") and UNITED AUTOMOBILE, AERO-SPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, and its LOCAL UNION 1186 (hereinafter referred to as the "Union"). The provisions of this agreement shall become effective **either (i) upon the Company's commencement of normal operations with a substantial and representative complement production and maintenance employees where a majority of said employees was represented by the Union at the Erie facility of Kaiser Aluminum & Chemical Corporation (hereinafter referred to as "Kaiser") or (ii) at such other time as the Company may lawfully recognize the Union and administer this Agreement relative to the employees identified in Article I, Section B."** No employer or company other than AKW L.P. is party to this Agreement.

## ARTICLE 1
## PURPOSE AND SCOPE

**Section A.  Coverage**

It is the intent and purpose of the parties to set forth herein certain agreements pertaining to wages, hours and working conditions to be observed between the parties, and to provide procedures for the prompt and equitable adjustment of grievances.

**Section B.  Recognition**

Effective either (i) upon the Company's com-mencement of normal operations with a substantial and representative complement of production and maintenance employees where a majority of said employees was represented by the Union at the Erie facility of Kaiser Aluminum & Chemical Corporation (hereinafter referred to as "Kaiser") or (ii) at such other time as the Company may lawfully recognize the Union and administer this Agreement relative to the Company's production and maintenance employees, the Company recognizes the Union as the exclusive collective bargaining agency for its production, mainte-nance and powerhouse employees, laboratory testers, time clerks and die room clerks, at its Erie Works in an appropriate bargaining unit consistent with standards adopted by the National Labor Relations Board, except and excluding office clerical employees, shop office employees, guards, professional employees and supervi-sors, as defined in the Labor Management Relations Act of 1947.  The provisions of this Agreement shall apply solely to those employees for whom the Union has been so recognized.

**Section C.  Direction of the Work Force**

Except as may be limited by the provisions of this Agreement, the operation of the Plant and the direction of the work force, including the right to hire, lay off, suspend, dismiss and discharge any employee for just cause, **to establish new jobs, or change existing jobs, increase or decrease the number of jobs, to determine the type, location and nature of the work to be performed within the plant and to establish, adjust or change produc-tion methods, materials, processes, products, equip-ment and operations** are exclusively vested with the Company.

**Section D.  Legal Rights**

Nothing in the Agreement shall be construed as waiving any rights or protection to the Company, the Union, or any employee under any applicable Federal or

6

7

State Law. Any provision found to be in conflict with any Federal or State Law will not abrogate any of the other provisions of this Agreement.

## ARTICLE 2
## UNION SECURITY

### Section A.

All present employees of the Company coming under provisions of this Agreement shall become, on the 91st calendar day after the effective date of the Agreement, members of the Union and remain members of the Union in good standing for the duration of this Agreement. All new employees, coming under provisions of this Agreement, shall become, on the 91st calendar day of their employment, members of the Union and remain in good standing for the duration of the Agreement as a condition of employment. An employee's membership shall be considered to be in good standing provided he/she has made payment or tendered to the Union his/her initiation fee and regular periodic dues. Such initiation fees and dues may be made by the employee in person or by the execution of an authorization directing the Company to deduct such dues from his/her wages. The above shall apply unless altered by Article No. 7, Section J.

### Section B.

The Union agrees that it will not, nor will it permit, its members to engage in solicitation of employees for payment of dues or fees on Company time, unless such solicitation has been previously approved by the Company.

## ARTICLE 3
## CHECK-OFF

### Section A. Procedure

1. For each employee from whom an individual written authorization has been received, the Company will deduct from the first complete pay period (week) in each month, Union dues for the current month; and will deduct one Initiation fee for each new member certified by the Union on or before the last calendar day of the preceding month. The amount to be deducted will be as prescribed by the International Union. Straight time earnings for the purpose of Union dues computation shall be based on the average earnings over a current (4) week period. All amounts deducted by the Company from the pay of each employee hereunder shall be remitted as promptly as possible to the Financial Secretary of the Local Union, together with a statement containing a listing of the names of employees

8

for whom dues deductions have been made and the amounts deducted.

2. If the employee does not work during the payroll period in which dues are deducted, no deductions will be made for that month; however, a deduction will be made for the following month if the employee has worked forty (40) hours during the previous month.

3. The Company or the Supplemental Unemployment Benefit Fund Trustee will deduct union dues from weekly Supplemental Unemployment Benefits in the same manner as described in Paragraph 1. The amount of such deduction will be as prescribed by the International Union. Should an employee subsequently have dues deducted from regular wages under Paragraph 2, any refunds of overpaid union dues shall be the sole responsibility of the Union.

### Section B. Indemnity

The Union hereby indemnifies the Company and holds it harmless against any and all claims of liability which may arise out of, or by reason of action taken or not taken by the Company, in compliance with check-off authorization cards or certified lists of Union membership furnished by or through the Union to the Company.

## ARTICLE 4
## ADJUSTMENT OF GRIEVANCES

### Section A. Purpose

It is the intent and purpose of this Article 4, which shall be available to both the Company and the Union, to provide for the presentation and equitable adjustment of grievances.

### Section B. Purpose

Any grievance arising under this Agreement or with respect to any terms or conditions of employment of the employees covered by this Agreement, shall be presented either through the proper Union representative or representatives or directly by the individual employee or group of employees involved, within fifteen (15) working days after the occurrence of the grievance, or shall be deemed to have been waived by the aggrieved party. Such fifteen (15) day period may be extended by mutual agreement for reasons of vacation, sickness and leaves of absence. Such grievances shall be presented to the proper representatives of the Company in the following steps:

**Step 1** - An employee or employees who feel they have a justifiable complaint or grievance shall discuss the matter with their immediate supervisor with or without their Union representative present. When a complaint has

9

been so submitted, the supervisor shall give an answer within twenty-four (24) hours.

**Step 2** - If the grievance is not satisfactorily solved in Step 1 above, then within five (5) working days thereafter, the aggrieved may reduce the grievance to writing on grievance forms provided by the Company; such is to be completed and signed by the employee or employees involved and their properly designated Union representative, and the completed grievance form then shall be delivered to the head of the department concerned or his designated representative . The head of the department or his designated representative shall, within five (5) working days from receipt of the written grievance, answer the grievance in writing and return it to the designated Union representative.

**Step 3** - If the grievance is not satisfactorily solved in Step 2 above, then prior to the expiration of five (5) working days from the date the grievance was returned by the Company to the Union representative , in compliance with Step 2 above, the Union may notify the Employee Relations Department in writing of appeal to Step 3. Such grievance shall then be discussed at a meeting or meetings to be held by the Union and the Employee Relations Department within ten (10) working days after the date of notice of appeal and a written disposition made thereof within ten (10) working days following the final Step 3 meeting. The Skilled Trades Representative may be present for Step 3 grievance discussions concerning Appendix B Skilled Trades issues or contracting out issues involving Skilled Trades. Either party may produce at the meeting any persons familiar with the facts involved to aid in the solution of the problem. A representative of the International Union may participate after the second step of the grievance procedure.

**Step 4** - Any grievance or dispute on the interpretation or application of the terms of this Agreement on which there is not satisfactory solution in Step 3, in absence of mutual agreement in writing to the contrary, must be appealed within ninety (90) days from the date of the disposition of the grievance in Step 3, by the accredited representative of the Union or the accredited representative of the Company , to an arbitrator whose decision shall be final and binding on the parties. The representatives of the Union and the Company shall meet within five (5) days after service of such notice of appeal for the purpose of mutually agreeing upon the selection of an arbitrator. In the event mutual agreement cannot be reached on the selection of an arbitrator within ten (10) days thereof, it is agreed that either party may, upon five (5) days' written notice to the other party, appeal to the Federal Mediation and Conciliation Service or the American Arbitration

Association to act as Arbitrator. The expense and salary incident to the services of the Arbitrator shall be shared equally by the Company and the Union.

**Section C.  General**
1. Grievances by the Company and grievances of a general nature by the Union shall be initiated in Step 3 and by a written statement thereof served by the aggrieved party upon the other.
2. Failure by either party to process a grievance within the time limits set forth will be deemed to be a waiver of the grievance unless time extensions have been mutually agreed upon. In the event of a later recurrence of any situation which gives rise to the grievance so waived, such waiver shall not constitute a binding precedent upon either party on the merits of the particular grievance.
3. Written grievances which may affect the financial status of an employee that may be settled pursuant to the above procedure shall be made retroactive as to the financial adjustment to the date of the occurrence of said grievance, unless otherwise mutually agreed to by the Company and the Union.

**ARTICLE 5**
**UNION REPRESENTATION**

**Section A.  Shop Committee**
All employees coming under the provisions of this Agreement shall be represented by a shop committee consisting of **four** employees, one of whom shall be chosen as Chairman. The Chairman and the Committeemen shall be assigned to various areas within the shop and will participate in the grievance procedure found herein. The Recording Secretary may be present at Step 4 grievance meetings and at special meetings between the Company and the Union. The Company will be liable for any lost wages so incurred. **The Local Union President may also participate in AKW's contract negotiations and grievance meetings, and the Company will be responsible for lost wages to the extent that he is an employee of AKW. With reasonable notice, will permit the Union President and other Union executive officers, employed by AKW, to engage in Local 1186 Union business during working hours, provided that the time spent will be reasonable. Time spent on Union business affecting UAW Local 1186/Kaiser will not be paid for by AKW. AKW will make an office and telephone available for use by the Union.**

10

11

three (3) month period without mutual agreement by the parties. Such vacation shutdowns must be scheduled by the Company prior to December 30 of the preceding year.

b. A vacation week consists of seven (7) consecutive calendar days, normally Monday through Sunday.

c. Employees may take day-at-a-time vacation to cover sixth or seventh work days that may occur. Scheduling and payment for these days, will be in accordance with the Letter of Agreement on day-at-a-time vacations found in the back of this Agreement.

## Section D. Reports

From time to time during the term of this Article, the Company shall furnish the Union, on forms and at times to be agreed upon, with such information as may be reasonably required for the purpose of enabling it to be properly informed concerning the operation of this Article.

## Section E. Vacation Pay

1. The vacation pay for a vacation of one week shall be the employee's average hours worked per week (not less than forty (40) hours and not more than forty-eight (48) hours multiplied by the employee's average earnings per hour (exclusive of overtime earnings). The maximum number of average hours per week for vacation pay purposes will be limited according to the following schedule effective:

January 1, 1989 - 44 hours per week
January 1, 1990 - 43 hours per week
January 1, 1991 - 42 hours per week

The vacation pay for two (2), three (3), etc., weeks shall be two (2), three (3) times, etc., that amount, respectively. The employee's average earnings per hour, as well as the employee's average hours worked per week, are averaged over the last Accounting calendar quarter which ended one month or more prior to the date on which the vacation period beings or the date the vacation is considered starting Excluded from such period will be any week in which a paid holiday is observed, or any week during which the employee received Jury Pay, Bereavement Pay, Witness Pay, or any week during which he/ she was on a paid vacation. Vacation pay computed on the basis of a calendar quarter prior to a general wage increase for a vacation or portion thereof scheduled after such wage increase in such year shall be adjusted for such increase in such year.

36

2. The vacation pay will be paid as follows:

a. Vacation pay for regular vacation will be paid prior to the time the employee leaves for vacation time off.

b. For the employee who requests that regular vacation be applied because of time lost or who works instead of taking time off, as described under C.2 and C.3, the vacation pay shall be paid him on the first regular pay day occurring not less than ten (10) days following the date the employee makes such request.

c. In the event of death of an employee who was eligible for a vacation, the amount of vacation pay to which he would have been entitled shall be paid to his proper legal representative.

## Section F.

In the event of a war or other national emergency or federal legislation designed to reduce the normal work week below 40 hours, either party may notify the other of a desire to negotiate with respect to an appropriate modification of this plan or its termination . In the event of failure to agree within 120 days from such notice, if given as a result of the above described type of federal legislation, the plan shall remain in effect subject to the termination provision of the Agreement, but the parties shall be free to strike or lock out in support of their position with respect to such matters (and no other ) notwithstanding the provisions of any other agreement between the parties.

## ARTICLE 16
## PENSION and GROUP INSURANCE BENEFITS

A.  Pension

The Pension benefits shall be set forth in a Pension Agreement and such Agreement is incorporated herein and made a part of this 1997 Labor Agreement by such reference.

B.  Group Insurance

1. The Group Insurance Benefits shall be set forth in booklets entitled Employee's Group Insurance Program and Retired Employee's Group Insurance Program, and such booklets are incorporated herein and made a part of this 1997 Labor Agreement by such reference.

2. It is understood that this Agreement, with respect to insurance benefits, is an agreement on the basis of benefits and that the revised benefits shall become effective on or about May 1, 1997, except as other wise provided in the applicable booklet, and further that such

37

103

benefits shall remain in effect for the term of this 1997 Labor Agreement.

## ARTICLE 17
## LEAVES OF ABSENCE

Personal leaves of absence may be granted by the Company for good cause for periods not exceeding thirty (30) days. **The company shall continue insurances for an employee on an approved leave of absence for a maximum of thirty (30) calendar days.** When indicated, the Company and the Union may agree to extensions of such leave not exceeding thirty (30) days for each such extension nor exceeding, in any event, a total leave extending for more than one (1) year.

An employee requesting a leave of absence shall make application to the Employee Relations Department on the form provided, and the Union shall be furnished with one copy of such application. Upon application to the Company, an employee elected or appointed to an office in the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, or elected or appointed to any position in any governmental body, or enters the Peace Corps, or Vista, shall be granted a leave of absence for the duration of his/her term of office or appointment and for sixty (60) days thereafter. Such employee shall retain his original seniority rights, and his seniority will accumulate during his leave of absence, provided he reports for and accepts work within sixty (60) days from the termination of his term of office.

An employee who fails to report to work within five (5) days from the expiration date of his leave of absence shall be considered to have voluntarily quit. An employee may terminate his leave of absence by giving at least seven (7) days' prior written notice to the Company. Employees entering the armed services of the United States will be granted leaves of absence during their periods of service and will be reinstated in accordance with the provisions of the applicable federal law. An employee who has been granted an approved leave of absence shall not be permitted to accept other work unless the approval of the Company and the Union has first been obtained.

## ARTICLE 18
## SAFETY

### Section A. Purpose
The Company agrees to maintain sanitary, safe and healthful conditions in accordance with the laws of the Federal, City, County and State Governments, and the

38

Union agrees that the employees shall cooperate in maintaining such conditions. In addition, the Company, through and in, its own safety programs, will have as its objective the elimination of accident and health hazards, and the Union shall cooperate toward the same end.

### Section B. Equipment
Protective devices, wearing apparel and other equipment necessary to protect employees from injury shall be provided by the Company in accordance with the practices now prevailing, or as the Company may improve such practices from time to time. The Union shall encourage the employees to utilize the prescribed devices, apparel and equipment , be they provided by the Company or otherwise, and failure to do so shall subject employees to Safety Rules and Rules of Conduct then prevailing.

**The company shall provide every active employee a voucher for the purchase of steel toe safety shoes. One voucher in the amount of $100 per employee shall be provided on the anniversary of each contract year.**

### Section C. Organization and Procedure
1. The Union may establish a Safety Committee of five (5) with a Chairman, for the purpose of assisting and working with the Company in matters of safety and health. This committee shall be an adjunct of, but subordinate to, the Shop Committee.
2. Suggestions and recommendations of the Safety Committee shall be given sincere and positive consideration, and shall be processed by whatever procedure the Company will establish to receive safety suggestions and recommendations .
3. The Company agrees that it will meet monthly with the Safety Committee for the purpose of discussing safety matters.
4. Safety grievances may be originated in Step 3 of the grievance procedure, after a Union member of the joint committee and the Safety Supervisor or his designee have had an opportunity to review and resolve the problem. Nothing in this Article 18 precludes an employee from grieving a safety issue after exhausting the above procedure .

### Section D. Prescription Safety Glasses
It is agreed that the Company will pay the total cost for an employee's prescription safety glasses. It is further agreed that should an employee have his glasses damaged as a result of an industrial accident in the plant, the Company will reimburse the employee the full cost of

39

**Section B.  Undesirable Acts**

1.  In view of the intent and purpose, and the desire to promote harmonious relations and good collective bargaining procedures, the Union agrees that it will not authorize or knowingly permit its members to cause or take part in any strikes, work stoppages, slow down, or interruptions or cessations or work during their term of this Agreement or extensions thereof, nor will the Company engage in any lockout of its employees.

2.  If such action should occur, it constitutes a breach of contract and the employee or employees involved are thereby subject to discipline or discharge.

3.  The Company and the Union agree that they will not exercise any coercion or intimidation upon any of the employees.

## ARTICLE 23
### SUPPLEMENTAL UNEMPLOYMENT BENEFITS

The Supplemental Unemployment Benefits Plan shall be set forth in a booklet, and such booklet is incorporated herein and made a part of this 1997 Labor Agreement by such reference.

## ARTICLE 24
### JURY AND WITNESS PAY

An employee who is called for jury service or as a result of being subpoenaed as a witness in a court of law shall be excused from work for the days on which he serves and he shall receive for each day of Jury or Witness service on which he otherwise would have worked eight (8) times his average straight time hourly earnings. The employee will present proof of service.

## ARTICLE 25
### BEREAVEMENT PAY

When death occurs in an employee's immediate family (i.e. employee's legal spouse, mother, father, mother-in-law, father-in-law, son, daughter, brother or sister, grandparents, grandchildren, brother-in-law, sister-in-law, son-in-law, daughter-in-law, stepmother , stepfather, step-son, step-daughter), an employee, upon request, will be excused up to three (3) days (or for such fewer days as the employee may be absent) on which he otherwise would have worked and which occurs within six (6) days of the death, funeral or service. After making written application, and provided that the relationship is one which is comprehended herein, the employee shall

**44**

receive pay for any such scheduled shift (up to 8 hours). In addition to the three (3) days above, one (1) additional day of bereavement will be added for eligible employees who have lost their mother, father, spouse, son, or daughter. Payment shall be made at the employee's regular straight time hour rate on the last immediately preceding scheduled day worked, excluding shift premium and overtime premium . An employee will not receive bereavement pay when it duplicates pay received for time not worked for any other reason. Time thus paid will not be counted as hours worked for purposes of determining overtime or premium pay liability. The following will be accepted by the Company as proof of an employee's relationship to the deceased listed in this article:

1.  A newspaper obituary, provided the employee's name and relationship are clearly stated;

2.  A signed statement from the funeral director involved with the arrangements;

3.  A properly sworn and notarized statement from a Magistrate

## ARTICLE 26
### PURPOSE, PRACTICES AND COOPERATION

**A.  AKW represents a new business aimed at increasing the Company's effectiveness in a very competitive product market with a view towards benefiting the Company and its employees. The parties acknowledge and agree that AKW's operation will involve jobs, production methods, materials, processes, products, equipment and operations that may differ from what have existed in the past. Likewise, the parties acknowledge and agree that this Agreement shall govern their relationship in connection with the issues addressed, and prior practices, letters and understandings will not affect or relate to the Company's operation except to the extent they have been reduced to writing and included in this Agreement. Finally, the Company and the Union recognize the importance of working with one another in the spirit of mutual cooperation with common objectives and will endeavor to continue their relationship with these goals in mind.**

## ARTICLE 27
### TERMINATION

A.  This Agreement shall terminate 60 days after either party shall give written notice of termination to the other party, but in any event, shall not terminate

**45**

earlier than **August 17, 2003**. If either party gives such notice, it may include therein notice of its desire to negotiate with respect to insurance, pensions and supplemental unemployment benefits (existing provisions or agreement as to insurance, pensions and Supplemental Unemployment Benefits to the contrary notwithstanding), and the parties shall meet within 30 days thereafter to negotiate with respect to such matters. If the parties shall not agree with respect to such matters by the end of 60 days after the giving of such notice, either party may thereafter resort to strike or lockout as the case may be in support of its position in respect to such matters, as well as any other matter in dispute (the existing agreements or provisions with respect to Insurance, Pensions and Supplemental Unemployment Benefits to the contrary notwithstanding).

Notwithstanding any other provisions of this agreement, or the termination of any or all other portions hereof, Article 16, Insurance benefits. and Article 23, Supplemental Unemployment Benefits, shall remain in effect until expiration of 60 days after written notice of termination served by either party on the other party on or after **January 30, 2004.**

B.   The Pension Agreement shall remain in effect until midnight, **January 30, 2004.**

Agreed to **as of this 18th day of August 1998** and signed **this day of October 18, 1998.**

For the Company AKW L.P.

_R. J. Giromini_
Richard J. Giromini

_Robert L. Nida_
Robert L. Nida

_Alan L. Prus_
Alan L. Prus

_Michael A. Diaco_
Michael A. Diaco

For the Union UNITED AUTOMOBILE, AEROSPACE, & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA and its LOCAL UNION NO. 1186

_Doug Ferguson_
Doug Ferguson

46

_Dave Erdely_
Dave Erdely

_Dennis Burger_
Dennis Burger

_Patrick Tomczak_
Patrick Tomczak

_Gary A. Montroy_
Gary A. Montroy

_Michael L. Sherbin_
Michael L. Sherbin

_Joseph J. Orlando_
Joseph J. Orlando

47

106

## SECTION 6

Whenever the Company determines that the skilled trades occupations are to be temporarily increased or to temporarily replace skilled trade occupation employees, this increase shall take place through the existing temporary bid system or daily upgrade procedure, whichever is appropriate. This temporary increase or replacement shall fully protect the equity of the Skilled Journeyman, and the temporary employee shall not accumulate seniority paragraph. This section shall be utilized to effectively and efficiently administer the work force and shall not be utilized to dilute the intent of this Skilled Trades Agreement.

## SECTION 7

In case of layoff in the skilled trades department, the following procedure shall be used:

A. Probationary Journeyman
B. Youngest seniority employee within the occupation
C. Recall shall be made in the reverse order of the layoff

## SECTION 8

The Company and the Union agree that the apprenticeship standards for Electricians and Millwrights will be maintained in a separate document and will be kept in compliance with the standards of the U.A.W International Union and applicable Federal and State laws.

## SECTION 9

All sections of the bargaining Agreement presently in effect which are not inconsistent with this supplement shall apply to the skilled trades departments.

## SECTION 10

The Company will keep accurate records of employees' time worked that would be applicable to their Skilled Trades Journeyman applications. Such employees shall verify their record semiannually.

## LOCAL AGREEMENT

Notwithstanding the provisions of Section 4, Paragraph C, of the skilled trades supplement agreement dated 12/1/68, and because it is not of this date feasible or practical to employ an apprentice in classifications other than Millwright and Electrician classifications, these permanent openings may be filled by employees with less than Journeyman qualifications when Journeymen are not available. In the event Journeymen are not available in the Millwright or Electrician classification, the Company will allow the job to be filled with less than full Journeymen qualifications when there is an indentured apprentice in

50

that classification. An incumbent under these conditions will be considered as a probationary Journeyman until such time as full qualifications are attained, as defined in Section 4, Paragraph C, and shall not attain skilled trades seniority until such time.

## APPENDIX C

### AKW L.P.
### AGREEMENT CONCERNING TRANSITIONAL ISSUES

1. **Hiring of Kaiser Employees By AKW.** AKW's hiring or consideration of Kaiser employees in connection with its May 1, 1997 commencement of operations ("Startup Employees") will take place as follows:

   (a) **Hiring into Unskilled Positions.** For all unit positions except the skilled positions listed in subparts b and c below, AKW would agree to commence operations by hiring, in order of Kaiser plant seniority, active or laid off Kaiser employees on the Kaiser-UAW seniority list as of April 8, 1997 (these people are referred to below as "Existing Kaiser Employees")

   (b) **Hiring into Skilled Positions.** For the following positions or their equivalent, AKW would agree to commence operations by hiring, in order of Kaiser plant seniority, the Existing Kaiser Employees that have shown satisfactory past performance in the job that he/she is seeking:

   Skilled Positions:
   Hot Inspector
   Pump Room Attendant
   Heat Treat Operator/Technician
   (past performance in either position acceptable)
   Spinner Operator
   Spinner Technician
   Furnace Control
   (past performance as Electrician also acceptable)
   Skilled Trade Agreement Positions:
   Millwrights
   Electricians
   Welders
   Machinists
   Instrument Persons
   (past performance as Electrician also acceptable)

   (c) **Hiring into Hydraulic Press Operator Classification.** For the Hydraulic Press Operator classification or its equivalent, AKW would agree to commence operations by hiring, in order of Kaiser seniority date in the Hydraulic Press Operator classification, the

51

Existing Kaiser Employees that have shown satisfactory past performance in that classification. However, all decisions concerning the Hydraulic Press Operator classification after AKW's commencement of operations will be based on AKW plant seniority consistent with AKW's UAW labor agreement.

(d) **Additional Consideration of Kaiser Employees.** If AKW's startup hiring needs for skilled positions identified in subparts b and c above, excluding the Skilled Trades Agreement positions identified in subpart b, cannot be satisfied using the above criteria, AKW is required, in good faith, to consult with the Union and give preferential consideration to Existing Kaiser Employees concerning such positions, provided that they possess the necessary skills and capabilities to perform the job, in view of AKW's production needs and business requirements. Disputes concerning the application of this paragraph would be subject to the grievance procedure.

(e) **Employee Applications.** In all cases, Existing Kaiser Employees will be hired or considered by AKW in connection with its commencement of operations only if the employees in question submit completed applications in writing to AKW on or before noon on Tuesday, April 8, 1997. Among other things, employee applications will give employees the opportunity to identify the AKW position(s) they are seeking, with AKW taking into account the preferences expressed by the applicant among multiple positions as well as the above criteria.

(f) **Skilled Trades Agreement.** AKW's startup hiring into positions covered by its separate UAW Skilled Trades Agreement will be handled in accordance with that Agreement as well as this Agreement Concerning Transitional Issues.

(g) **Other Startup Hiring by AKW.** If AKW's startup hiring needs cannot be satisfied using the above criteria (for example, if there are insufficient applications from Existing Kaiser Employees for certain positions, or if some skilled positions would remain unfilled notwithstanding consultation with the Union and giving preferential consideration to Existing Kaiser Employees), AKW may hire other applicants for employment in connection with its commencement of operations.

52

(h) **Applications From Employees Having Work Restrictions.** AKW will consider applications submitted in a timely manner (i e., by noon on Tuesday, April 8, 1997) by employees who believe their work restrictions prevent them from working (i.e., performing the essential job functions in the positions they are seeking) These employees should specify the relevant work restrictions and provide appropriate documentation along with their application. If the employees are given return-to-work authorization by their health care provider, and if the return-to-work is effective within the 90 calendar days following AKW's commencement, AKW would hire or consider those employees for vacant or filled positions within AKW, consistent with the Transitional Agreement. Any employment offer would still be subject to the completion of AKW's preemployment physical and drug/alcohol screen, with the understanding that any hiring of such persons will cause bumping within AKW and the return to Kaiser of a corresponding number of AKW employees, provided that those employees have not retired from Kaiser. Any AKW employee bumped by a person hired under this paragraph can elect to bump within AKW or to return to Kaiser. This return to Kaiser will occur with full seniority provided that the UAW negotiates an agreement with Kaiser to this effect.

2. **Qualification/Disqualification Issues at Startup.** Qualification and disqualification issues which arise in connection with AKW's commencement of operations will be addressed as follows:

(a) **Qualification/Disqualification In General.** Existing Kaiser Employees employed by AKW in connection with its commencement of operations will be given a trial period of 10 work days or 30 work days in order to qualify (depending on the position, consistent with Article 7, Section D of the AKW Labor Agreement (Seniority, Promotions)) If such an employee is deemed by AKW to be unqualified for the particular position being sought, the disqualification shall be reduced to writing, stating the reasons for disqualification, consistent with Article 7, Section D of the AKW Labor Agreement (Seniority, Promotions). Such disqualified employee will thereupon be returned to his/her former Kaiser job with full

53

seniority privileges (to the extent that the Union negotiates such an agreement with Kaiser)

(b) **Qualification Period Not Required Where Satisfactory Past Performance Exists.** Existing Kaiser Employees who show satisfactory past performance in the job being sought will not be required to go through a qualification trial period in connection with AKW's commencement of operations. Such an employee will be subject to potential disqualification by AKW, however, if his or her actual job performance is unsatisfactory, provided that (i) AKW consults in advance with the Union, and (ii) the employee has been counseled prior to any disqualification being processed, and (iii) the disqualification shall be reduced to writing, stating the reasons for disqualification, consistent with Article 7, Section D of the AKW Labor Agreement (Seniority, Promotions).

(c) **Timing of Disqualification and Effect.** The timing and effect of AKW disqualifications among Existing Kaiser Employees will be handled as follows:

(1) **Disqualifications Within AKW's First 90 Calendar Days.** If a disqualification occurs within the first 90 calendar days after AKW's commencement of operations, the disqualified employee will be returned to his/her former Kaiser job with full seniority privileges (to the extent that the Union negotiates such an agreement with Kaiser). The employee's return to Kaiser will take place as soon as possible following disqualification, consistent with production needs, business requirements and the potential hiring by AKW of another Kaiser employee in his or her place, which will be handled in accordance with paragraphs 6 and 7 below.

(2) **Later Disqualifications Among Substitute Startup Employees.** Except for the situation referenced in paragraph 6(c)(4) below, the disqualification, more than 90 days after AKW's commencement of operations, among a Substitute Startup Employee (defined in paragraph 6 below) will likewise result in the employee's return to his/her former Kaiser job with full seniority privileges (to the extent that the Union negotiates

such an agreement with Kaiser)

(3) **Later Disqualifications Among Other Employees.** Disqualification of any other AKW employee more than 90 calendar days after AKW's commencement of operations, except for those referenced in paragraph 6(c)(4) below, will not result in the employee's return to Kaiser and will be handled in accordance with AKW's UAW Labor Agreement.

3. **Physical Examinations.** Employment offers extended to Existing Kaiser Employees in connection with AKW's commencement of operations, and to all other applicants, will be conditioned on the individual's completion of a physical examination to be arranged by AKW at its expense. The parties agree that the results of any physical examination will not be used or relied upon to exclude any prospective employee from employment with AKW, except for situations where the health care provider identifies restrictions which prevent the employee from performing essential job functions with reasonable accommodation.

4. **Drug/Alcohol Screen.** Employment offers extended to Existing Kaiser Employees (defined above) in connection with AKW's commencement of operations, and to all other applicants, will also be conditioned on the employee's completion of a drug/alcohol screen producing negative results. A positive drug/alcohol screen will disqualify any applicant from employment with AKW.

(a) **Confidentiality of Results.** The results of any drug/alcohol screen will be treated as highly confidential and will be made available on a strict "need to know" basis only to AKW management representatives, whose identities will be disclosed to the Union in advance, who are directly involved in the AKW hiring process. The results may also, on a strictly confidential basis, be disclosed to and discussed with an outside medical review officer or health care professional who may be consulted by AKW concerning any positive results.

(b) **Non-Disclosure to Third Parties.** Based on their sensitive and confidential nature, the results of any drug/alcohol screen among bargaining unit employees will not be made available, absent the applicant's written consent, to management officials at Accuride Corporation, Kaiser Aluminum & Chemical

54

55

109

Corporation, or other third parties or persons apart from AKW management representatives and outside medical review officers or health care professionals referenced above. In the event of a positive drug/alcohol screen, the applicant will be informed of the results in a confidential manner, and no third party will be informed of the circumstances surrounding the applicant's failure to be employed at AKW. In such a situation, the applicant will also be given the opportunity to withdraw his/her application for employment by AKW.

5.   **90-Day Window For AKW Employees to Return Voluntarily to Kaiser.** Those Existing Kaiser Employees (defined above) who are hired by AKW in connection with its commencement of operations can exercise a one-time election to return to Kaiser with full seniority privileges (to the extent the Union negotiates such an agreement with Kaiser), subject to the following conditions and paragraphs 6 and 7 below:

   (a) **Time, Manner and Processing of Election.** The voluntary election to return to Kaiser must be in writing and received by AKW within 90 calendar days after AKW's commencement of operations (the "90-Day Election Period"). At the end of the 90-Day Election Period, AKW will assemble the employee elections, and provide to the Union and to Kaiser a written list of employees who have elected to return to Kaiser.

   (b) **Additional Coordination Period.** After making an election to return to Kaiser, the employee(s) in question must continue to report for work at AKW and satisfy normal work requirements until AKW coordinates with Kaiser concerning arrangements for the employee's return in a manner that causes the least disruption to AKW and to Kaiser. This extra period (the "Coordination Period") will not last longer than an additional 45 calendar days beyond the end of the 90-Day Election Period. The Company and Union may mutually agree to an additional 45 calendar day extension in the Coordination Period, or other adjustment, based on business needs and production requirements.

6.   **AKW's Treatment of "substitute Startup" Kaiser Employee(s).** If Existing Kaiser Employees hired by AKW at its commencement of operations are returned to Kaiser because of disqualification or

56

voluntary election (see paragraphs 2 and 5 above), other Existing Kaiser Employees (referred to as "Substitute Startup Employees") will be hired or considered by AKW as follows:

   (a) **Applicants and Order of Selection.** Substitute Startup Employees will be selected from the Existing Kaiser Employees whose applications were submitted to AKW by April 8, 1997. These selections will result from the same criteria governing initial startup hiring decisions as set forth in paragraph 1 above. However, AKW employees who return voluntarily to Kaiser will not be considered for any later startup hiring or substitute startup hiring by AKW. If an AKW Startup Employee or Substitute Startup Employee is disqualified, resulting in his or her return to Kaiser, the returned employee will be considered for later startup hiring or substitute startup hiring by AKW that may take place after the employee's disqualification.

   (b) **Replacing Voluntary Returns to Kaiser.** If the Substitute Startup Employee is hired by AKW as the result of an employee's voluntary election to return to Kaiser (see paragraph 5), the Substitute Startup Employee will receive credit for Kaiser plant seniority on the same basis as that applicable to Existing Kaiser Employees who were hired by AKW in connection with its commencement of operations. The Substitute Startup Employee will be hired by AKW, to the extent possible, during the Coordination Period and/or at the same time that Kaiser accepts back the AKW employee who is being replaced by the Substitute Startup Employee. The Substitute Startup Employee will not have any future voluntary election to return to Kaiser with seniority privileges. If the Substitute Startup Employee is disqualified within 30 days following his/her commencement of work at AKW (or within 10 days if a 10-day disqualification trial period is applicable), the person will return to his/her former Kaiser job with full seniority privileges (to the extent that the Union negotiates such an agreement with Kaiser). In such a situation, AKW would agree to hire one additional Substitute Startup Employee (the "Second Substitute Startup Employee"), who would receive credit for Kaiser plant seniority on the same basis as that applicable to Existing Kaiser Employees who

57

were hired by AKW in connection with its commencement of operations. However, the Second Substitute Startup Employee would not have any future right (based on voluntary election or disqualification) to return to Kaiser with seniority privileges, nor would AKW be required to hire an additional Substitute Startup Employee in his or her place in the event of the person's departure from AKW.

(c) <u>Replacing Disqualified Employees.</u> If an AKW startup employee is disqualified, resulting in his or her return to Kaiser, the Substitute Startup Employee replacing the disqualified employee will receive credit for Kaiser plant seniority on the same basis as that applicable to Existing Kaiser Employees who were hired by AKW in connection with its commencement of operations. Other issues will be handled as follows:

    (1) <u>Timing of Substitute Startup Employees' Hiring by AKW.</u> The Substitute Startup Employee will be hired by AKW, to the extent possible, at the same time that Kaiser accepts back the AKW employee he or she is replacing.

    (2) <u>Possible Voluntary Return to Kaiser.</u> If the Substitute Startup Employee begins active employment with AKW within the 90-Day Election Period, he or she may exercise the one-time election to return to Kaiser if the election is in writing and received by AKW within 90 calendar days after AKW's commencement of operations. Other aspects of such an election will be governed by paragraph 5 above. Any Substitute Startup Employee who begins active employment with AKW after the end of the 90-Day Election Period cannot exercise any voluntary election to return to Kaiser.

    (3) <u>Disqualification of Substitute Within 90-Day Election Period.</u> If a Substitute Startup Employee is disqualified during the 90 calendar days following AKW's commencement of operations, he or she will be returned to his/her former Kaiser job with full seniority privileges in accordance with paragraph 2 above. In such a situation, AKW will hire or consider another Substitute Startup

58

Employee in accordance with this paragraph 6(c).

    (4) <u>Substitute Hired Towards End of 90-Day Election Period and Disqualified Later.</u> If a Substitute Startup Employee begins his or her employment with AKW within 90 calendar days after AKW's commencement of operations, and if the employee's 10- or 30-work day qualification trial period ends after the conclusion of that 90-calendar day period, the employee's disqualification at the end of the trial period will cause his/her return to the former Kaiser job with full seniority privileges in accordance with paragraph 2 above. In such a situation, AKW will hire or consider another Substitute Startup Employee who would receive credit for Kaiser plant seniority (on the same basis as that applicable to Existing Kaiser Employees who were hired by AKW in connection with its commencement of operations); however, he or she would not have any future opportunity (based on voluntary election or disqualification) to return to Kaiser with seniority privileges.

    (5) <u>Disqualified Substitute Startup Employees Following Voluntary Returns to Kaiser.</u> As noted in paragraph 6(b) above, AKW will hire or consider an Existing Kaiser Employee to replace a startup AKW employee who exercises a voluntary election to return to Kaiser within the 90-Day Election Period. If the Substitute Startup Employee is disqualified within 30 days following his/her commencement of work at AKW (or within 10 days if a 10-day disqualification trial period is applicable), the person will return to his/her former Kaiser job with full seniority privileges (to the extent that the Union negotiates such an agreement with Kaiser). In such a situation, AKW would agree to hire one additional Substitute Startup Employee (the "Second Substitute Startup Employee"), who would receive credit for Kaiser plant seniority on the same basis as that applicable to Existing Kaiser Employees who were

59

111

hired by AKW in connection with its commencement of operations. However, the Second Substitute Startup Employee would not have any future right (based on voluntary election or disqualification) to return to Kaiser with seniority privileges, nor would AKW be required to hire an additional Substitute Startup Employee in his or her place in the event of the person's departure from AKW.

7. **Other Requirements Concerning Returning to Kaiser or Hiring of Kaiser Employees.** The possible return of any AKW employee to Kaiser based on disqualification or voluntary election, and AKW's hiring of Existing Kaiser Employees (see paragraphs 2, 5 and 6 above), are subject to the following additional requirements:

(a) **Kaiser Retirement Preludes Return to Kaiser.** Any employee who retires from Kaiser will not have the opportunity to return to Kaiser either based on disqualification or voluntary election.

(b) **Treatment of Vacation.** If an AKW employee returns to Kaiser because of disqualification or voluntary election, the individual's remaining accrued but unused 1997 vacation benefit would, at the time of his/her separation from AKW, be paid by AKW. Any vacation requests for the remainder of 1997 after the employee's return to Kaiser would have to be unpaid and considered by Kaiser pursuant to the Kaiser labor agreement. In any event, the individual's total vacation benefit for 1997 would not exceed what the benefit would have been had the person continued to work continuously either for Kaiser or AKW, respectively.

(c) **Specific Staffing Concerns or Issues.** If specific staffing concerns arise during the transition/hiring process (e.g., if certain skills appear to unavailable among applicants for AKW positions, if departing employees threaten to create skill shortages at Kaiser, etc.), AKW and the Union will consult with one another in good faith to eliminate the problems or issues. Concerning such situations, the parties further agree as follows:

(1) **Further Adjustments in Timing of Employee Hiring/Transitions.** Notwithstanding the time periods specified above, AKW may further adjust the

60

timing of employee hiring and/or transitions as reasonably necessary to address staffing concerns, business needs or production requirements resulting from AKW's commencement of operations, with the understanding that these timing adjustments will not exceed 45 calendar days in length. The Company and Union may mutually agree to an additional 45 calendar day extension or other adjustment that may be warranted by staffing concerns, business needs or production requirements.

(2) **Delayed Initial Hiring By AKW and Impact on 90-Day Election Period.** If AKW delays hiring an Existing Kaiser Employee, pursuant to paragraph 7(c)(1), where that Employee would otherwise have been hired by AKW when it commenced operations, AKW agrees as follows:

(i) **Impact on AKW Seniority.** AKW agrees in such a situation that the Employee's AKW plant seniority date would not be adversely affected based on the delay and the Employee would be treated for seniority purposes as if there had been no delay.

(ii) **Impact on 90-Day Election to Return.** AKW agrees in such a situation that it will extend the time for the Employee to exercise the one-time voluntary election to return to Kaiser (set forth in paragraph 5 above) as long as AKW receives written notice of the Employee's election within 90 calendar days after the Employee's commencement of employment with AKW. If the Employee elects to return to Kaiser, AKW will hire or consider a Substitute Startup Employee who would receive credit for Kaiser plant seniority (on the same basis as that applicable to Existing Kaiser Employees who were hired by AKW in connection with its commencement of operations). The Substitute Startup Employee will not have any

61

future voluntary election to return to Kaiser with seniority privileges. If the Substitute Startup Employee is disqualified within 30 days following his/her commencement of work at AKW (or within 10 days if a 10-day disqualification trial period is applicable), the person will return to his/her former Kaiser job with full seniority privileges (to the extent that the Union negotiates such an agreement with Kaiser). In such a situation, AKW would agree to hire one additional Substitute Startup Employee (the "Second Substitute Startup Employee"), who would receive credit for Kaiser plant seniority on the same basis as that applicable to Existing Kaiser Employees who were hired by AKW in connection with its commencement of operations. However, the Second Substitute Startup Employee would not have any future right (based on voluntary election or disqualification) to return to Kaiser with seniority privileges, nor would AKW be required to hire an additional Substitute Startup Employee in his or her place in the event of the person's departure from AKW.

**(3) Timing Adjustments Limited to Startup and Related Employment Actions.** AKW will delay the hiring of Existing Kaiser Employees and/or adjust the timing of employee hiring/transitions only in connection with AKW's commencement of operations and related actions described in paragraphs 1-7 above.

**(d) Additional Agreements or Issues to be Addressed.** The proposals concerning a one-time 90-day election for employees to return to Kaiser and the hiring of Substitute Startup Employees (set forth in paragraphs 5, 6 and 7 above) are subject to reaching additional agreements on any other benefits-related and other issues implicated in these actions.

**(e) Probationary Issues.** Existing Kaiser Employees who are hired by AKW in connection with its commencement of operations or as

62

Substitute Startup Employees (as defined in paragraph 6 above) will not be subject to a probationary period under Article 7, Section J of the AKW Labor Agreement (Seniority, Probationary Employees).

**(f) Union Representation During Transition.** The parties agree that AKW's startup, for 90 calendar days following the May 1, 1997 commencement of operations, will require close coordination between AKW, Kaiser and UAW officers and committee members, providing an essential service to Kaiser and AKW. Therefore, for 90 calendar days following AKW's commencement, Kaiser Union officers and committee members, who would otherwise be reimbursed for lost wages while on Union business, will be reimbursed by Kaiser for Union business required to address AKW matters on a transitional basis. Likewise, for 90 calendar days following AKW's commencement, AKW Union officers and committee members, who were employed by Kaiser prior to May 1, 1997 and who would otherwise be reimbursed for lost wages while on Union business, will continue to be reimbursed by Kaiser as Kaiser employees for Union business required to address Kaiser matters on a transitional basis.

8. **Future Hiring By AKW.** Apart from employment decisions made in connection with AKW's commencement of operations, AKW will give preferential consideration for available, vacant positions to other Existing Kaiser Employees (as defined above) who apply for work with AKW, with the understanding that these individuals if hired would be new AKW employees without receiving credit for Kaiser service and without any future opportunity (based on voluntary election or disqualification) to return to Kaiser with seniority privileges. This will not, however, prevent any laid off Kaiser employee from exercising Kaiser recall rights in the event of recall by Kaiser under the terms of the Kaiser-UAW labor agreement.

9. **Benefits/Pensions.** In connection with AKW's commencement of operations, AKW will agree to handle benefit/pension issues as follows:

**(a) Pension/Benefit Structure in General.** Subject to an agreement on all other issues, AKW is willing to create and establish relevant insurance, pension and related benefit plans producing a basic benefit structure that is the same or very similar to the benefit structure

63

made available to Existing Kaiser Employees (defined above) who are hired by AKW in connection with its commencement of operations.

(b) **Additional Agreements or Issues to be Addressed.** The agreement in subpart (a) above is subject to AKW's ability to resolve any additional benefits issues and related variables that may exist in this area; the successful negotiation of necessary terms with health care providers and/or insurance carriers; and other factors implicated in the creation and establishment of appropriate benefit plans.

(c) **Seniority Credit for Various Purposes.** AKW is willing to give credit for Kaiser seniority, for purposes of vesting under AKW's pension plan and for purposes of wages and all other benefits (excluding pension/retirement benefit calculations) such as but not limited to promotion, demotion, layoff, recall, vacations, shift preference, SUB benefits, Sickness and Accident benefits, and Savings Plan benefits, to (i) Existing Kaiser Employees who are hired in connection with AKW's commencement of operations and (ii) the Substitute Startup Employees who are identified above as being afforded such seniority credit. The Kaiser plant seniority credit provided to these employees will be counted as part of their AKW seniority under the AKW labor agreement's seniority article.

(d) **No Seniority Credit Based on Later Hiring.** Apart from employees hired in connection with AKW's commencement of operations, and the Substitute Startup Employees identified above as being afforded credit for Kaiser seniority, other Existing Kaiser Employees hired by AKW will have the opportunity to participate in AKW's benefit plans but without receiving credit for Kaiser seniority.

10. **Pension Multiplier Increases.** After creating the AKW pension plan (see paragraph 5 above), AKW anticipates that future proposed increases or changes will be the subject of negotiation between AKW and the Union. AKW is unwilling to be bound by the results of the Union's separate negotiations with Kaiser. Kaiser will be responsible for addressing questions concerning the extent and nature of any proposed increases or changes discussed during UAW-Kaiser negotiations.

64

11. **Disputes Subject to Grievance Procedure.** Disputes concerning the application of this Agreement Concerning Transitional Issues will be subject to the grievance procedure set forth in Article 4 of AKW's UAW Labor Agreement (Adjustment of Grievances).

12. **Agreement Conditioned on Overall Agreement and Ratification.** This Agreement Concerning Transitional Issues is conditioned on the parties' agreement concerning all other outstanding issues, and the complete acceptance and ratification, no later than Sunday, April 13, 1997, of the collective bargaining agreement proposed by AKW, including appendices, letters and memoranda, job classification lists, schedules, benefit plans and descriptions, and other documents referenced in this Agreement and in the proposed collective bargaining agreement. If AKW does not receive written notice of acceptance and ratification by Sunday, April 13, 1997, this Agreement shall become null and void and will have no force or effect.

Agreed to this ___ day of April 1997.

For the Company AKW L.P.

_____
Alan L. Prus

For the Union UNITED AUTOMOBILE, AEROSPACE, & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA and its LOCAL UNION NO. 1186

_____
Doug Ferguson

_____
Dave Erdely

_____
Dennis Burger

_____
Patrick Tomczak

_____
Gary A. Montroy

_____
Michael L. Sherbin

_____
Joseph J. Orlando

65

114

Letter of Agreement

The Negotiating Committee
United Auto Workers, Local 1186
1015 East 12th Street
Erie, Pennsylvania 16503

Subject: Opting Out/Opting Down Issues and AKW/Kaiser Insurance

Gentlemen:
      This letter confirms that agreement that has been reached concerning "opting down" and "opting out" issues under the Joint Venture ("AKW") group insurance plan. During the 1997 negotiations, many questions were raised regarding the option to cover the employee only and allow the spouse's insurance to cover the spouse and any other dependents. Another question that was raised asked if employees could opt off insurance entirely.
After consulting with the bargaining committee of the union, our policy in this regard is as follows:

A. AKW Employees in General
The following policy governs the treatment of AKW group insurance for all AKW employees (except for situations addressed in Part B below):

   1) As a general rule (excluding only those situations addressed in Part B below), all employees must have AKW group insurance coverage on themselves.

   2) Again excluding situations addressed in Part B below, if an employee's dependents have other insurance coverage available, and the employee can verify this coverage to the company, the employee may opt down to single coverage.

   3) Once a decision is made to opt down, it remains in effect for the calendar year unless the spouse loses their coverage. If that occurs, Employee Relations should be notified at once and the Company will immediately enroll the dependents.

To put it simply, our general policy is that employees can opt down but not out, excluding situations addressed in Part B below.

B. "Opting Out" and Coordination of Kaiser/AKW Retiree Medical Insurance
The following policy has been agreed upon concerning the treatment of "opting out" issues and retiree medical and life insurance for those eligible AKW startup and substitute startup employees who, by September 15, 1997, have retired under the Kaiser hourly pension plan (these individuals are referred to below as "Startup Kaiser Retirees"):

   1) Startup Kaiser Retirees will be permitted to "opt out" of AKW medical/life insurance by making an irrevocable, one-time voluntary election, at the time they retire from Kaiser on or before September 15, 1997, to elect Kaiser retiree medical and life insurance coverage for themselves and any dependents in lieu of any AKW medical and life insurance coverage. If these individuals elect Kaiser retiree medical and life insurance coverage, they will not be covered at any future time by any AKW medical and life insurance.

   2) If the irrevocable, one-time voluntary election by the Startup Kaiser Retirees is to elect AKW medical and life insurance coverage for themselves and any dependents, and where they satisfied all of the requirements for contribution-free Kaiser retiree medical insurance coverage as of September 15, 1997 (i.e., they had 85 points), these individuals (and their dependents) will participate in AKW's medical and life insurance plan while working at AKW. When these individuals leave or retire from AKW, Kaiser rather than AKW will be responsible for providing any retiree medical and life insurance.

   3) If the irrevocable, one-time voluntary election by the Startup Kaiser Retirees is to elect AKW medical and life insurance coverage for themselves and their dependents, and where they have not satisfied all of the requirements for contribution-free Kaiser retiree medical insurance coverage as of September 15, 1997 (i.e., they had less than 85 points), these individuals (and their dependents) will participate in AKW's medical and life insurance plan while working at AKW and following their departure or retirement from AKW.

   4) Startup Kaiser Retirees who elect AKW coverage will not have the ability to "opt down" to single coverage based on any potential availability of dependent coverage under a Kaiser medical insurance plan. However, these Startup Kaiser Retirees, while covered under AKW medical insurance, may "opt down" to single coverage for themselves pursuant to Part A above (point 2) provided that the employee can verify coverage for their dependents from a source other than Kaiser.

108

109

115

Agreed and accepted as of this 18th day of **August** 1998

For the Company AKW L.P.

_____

Alan L. Prus

Agreed and accepted as of this 18th day of **August** 1998

For the Union UNITED AUTOMOBILE, AEROSPACE, & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA and its LOCAL UNION NO. 1186

_____

Doug Ferguson

_____

Dave Erdely

_____

Dennis Burger

_____

Patrick Tomczak

_____

Gary A. Montroy

_____

Michael L. Sherbin

_____

Joseph J. Orlando

110

---

Letter of Agreement

The Negotiating Committee
United Auto Workers, Local 1186
1015 East 12th Street
Erie, Pennsylvania 16503

Subject: Benefit Plan Review

Gentlemen:

During the 1997 negotiations, the Company and the UAW reached tentative agreement on pension benefits as part of a pension plan proposed by the Union with marked-up changes and riders provided by the Company (herein-after "JV Pension Plan"). The Union's proposal was modeled after a pension plan adopted by Kaiser Aluminum effective October 1, 1994. The JV Pension Plan was Attachment 4 to the written tentative agreement presented to the Union on March 20, 1997 (dated 3/20B/97), which the Union accepted subject to further benefits review by letter dated March 26, 1997. The parties also reached tentative agreement on savings plan benefits (hereinafter "JV Savings Plan") and supplemental unemployment benefits (hereinafter "JV SUB Plan") consistent with plan documents provided to the Union as Attachments 5 and 6 to the same written tentative agreement.

The Company agrees to consult in good faith with the Union during the term of this Agreement with respect to any other issues that might be raised concerning the JV Pension Plan, the JV Savings Plan and the JV SUB Plan. However, changes in the relevant plans may be made only to the extent mutually agreed upon by the Company and the Union.

The parties have entered into this understanding to enable the Company and the Union to finalize their collective bargaining agreement. The parties agree that their collective bargaining agreement shall remain in effect for its term notwithstanding any consultation that takes place pursuant to this letter.

Agreed and accepted as of this 18th day of **August** 1998

For the Company AKW L.P.

_____

Alan L. Prus

Agreed and accepted as of this 18th day of **August** 1998

For the Union UNITED AUTOMOBILE, AEROSPACE, & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA

111

## Letter of Agreement

Negotiating Committee
UNITED AUTO WORKERS
Local 1186
1015 East 12 Street
Erie, PA 16503

Subject: TEMPORARY EMPLOYEES

Subject:
    During the 1998 negotiations, it was agreed that the Company will, after consulting with the Union, with mutual agreement, hire temporary employees for summer vacation relief and consult with the Union if an emergency arises requiring the hiring of temporary employees during non-summer months. In no event shall the temporary employees work more than 100 days or displace any existing AKW employees. Mutual agreement is required between the Company and the Union.

For the Company

_____
Alan L. Prus

_____
Mike Diaco


For the Union

_____
Doug Ferguson

_____
Dave Erdely

_____
Dennis Burger

_____
Patrick Tomczak

_____
Gary A. Montroy

116

Negotiating Committee
UNITED AUTO WORKERS
Local 1186
1015 East 12 Street
Erie, PA 16503

Subject: HEALTH INSURANCE
    The Company and Union agreed to maintain current employee contribution rates for health insurance (medical and dental), however the company has the right to select alternative carriers who provide equal or better benefits at equal or lower costs.
    The Northwest Pennsylvania Manufacturer's Association will be jointly consulted by the Company and Union to determine if health insurance benefits, equal to or better than those currently provided, can be obtained at lower cost (the same will be done for dental insurance).

_____
Alan L. Prus

_____
Mike Diaco


For the Union

_____
Doug Ferguson

_____
Dave Erdely

_____
Dennis Burger

_____
Patrick Tomczak

_____
Gary A. Montroy

117

117