1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   ACCURIDE ERIE, L.P.,              :
    a limited partnership,            :
4              Plaintiff             :
                                      :
5       v.                            :    CV 05-169 Erie
                                      :
6   INTERNATIONAL UNION, UNITED       :
    AUTOMOBILE AEROSPACE &            :
7   AGRICULTURAL IMPLEMENT            :
    WORKERS OF AMERICA, LOCAL         :
8   UNION 1186, a voluntary           :
    unincorporated association,       :
9              Defendant             :

10

11          Hearing in the above-captioned matter held

12      on Friday, April 28, 2006, commencing at 2:24

13      p.m., before the Honorable Sean J. McLaughlin,

14      at the United States Courthouse, Courtroom C, 17

15      South Park Row, Erie, Pennsylvania 16501.

16

17  For the Plaintiff:
         Frederick C. Miner, Esquire
18       Ryley Carlock & Applewhite
         One North Central Avenue
19       Suite 1200
         Phoenix, AZ 85004-4850
20

21  For the Defendant:
         Catherine J. Trafton, Esquire
22       International Union, UAW
         8000 East Jefferson Avenue
23       Detroit, MI 48214

24
                 Reported by Janis L. Ferguson, RPR
25

1                          I N D E X

2

3    TRANSCRIPT OF PROCEEDINGS . . . . . . . . . . . . . . .  3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  This is the time we set for argument
 2   at Civil Action 05-169 Erie.
 3                 I've had an opportunity to read the briefs,
 4   I'm familiar with the case law.  Essentially we're dealing
 5   with cross-motions for summary judgment.  Accuride is moving
 6   to vacate an arbitration award, and International Union,
 7   Defendant, is essentially moving to confirm it.
 8                 It doesn't make one heck of a lot of
 9   difference who I hear from first, but since Accuride is the
10   Plaintiff, let me hear what you have to say.
11            MR. MINER:  Thank you.  Your Honor, may it please
12   the Court, my name is Fred Miner for Ryley Carlock &
13   Applewhite, on behalf of Accuride Erie.
14                 The case involves an arbitration award, Your
15   Honor, as you're aware, and so the action rises or falls on
16   whether the award should be enforced or vacated --
17            THE COURT:  I don't mean to interrupt you, but as
18   I understand it, by way of brief background, there had been
19   a previous arbitration award where this very issue was
20   addressed, and the issue, for the record, of course, is
21   the -- the addendum, if you will, to I believe the 1997 or
22   1998 agreement wherein various Kaiser employees made an
23   irrevocable decision, per the language of the contract, to
24   opt out of the opportunity to obtain insurance coverage from
25   their new employer, if you will, and remain with Kaiser.
```

```
 1              The original arbitration award, as I
 2   understand it, was in favor of the company.  And for the
 3   reasons that are set forth in the award.
 4              Subsequent to that -- subsequent to that, the
 5   issue raises its head again.  Now, now we're on to the
 6   arbitration award that forms the subject matter of this
 7   case.
 8              Let me ask you a couple of questions about
 9   the award and the applicable legal standard.  Would you
10   agree that the legal issue here is whether or not, as that
11   term is defined, the arbitrator's award draws its essence
12   from the Collective Bargaining Agreement?
13         MR. MINER:  That is the guiding standard in this
14   case, Your Honor.  You're absolutely right.
15         THE COURT:  All right.  And would it be fair to
16   say, with perhaps certain exceptions, that an arbitrator is
17   entitled to be wrong factually, and an arbitrator is
18   entitled to be legally incorrect, but those two failures
19   will not necessarily give a reviewing Court like me the
20   power to unscramble the egg?  Is that generally true as a
21   proposition?
22         MR. MINER:  Yes it is, Your Honor.
23         THE COURT:  Okay.  Now, here is my question:  That
24   was a long-winded way of getting to it.  Let's put aside for
25   the time being the arbitrator's ruminations about what
```

1    parties -- what the parties must have intended and what must

2    have -- what makes common sense, and I want to focus on the

3    other aspect of his decision, which was this:  He looks at

4    the new Collective Bargaining Agreement, he looks at the

5    four corners of the agreement, and essentially he says --

6    his rationale goes like this:  I look in vain for any

7    mention of the irrevocability agreement that had existed as

8    an addendum to the previous contract.  The parties were

9    capable of including it, the agreement is silent.  The folks

10   who want to partake of the benefits are eligible employees

11   within its meaning.

12           Why -- even if he's wrong, why wasn't that

13   decision based upon an interpretation of the Collective

14   Bargaining Agreement?

15           MR. MINER:  Your Honor, initially -- and I will

16   respond immediately to your question.  But initially I don't

17   think that's -- I don't think it is necessary for the Court

18   to ignore the reasoning of the arbitrator in order to

19   justify what he did.  And that's the guidance the Third

20   Circuit has provided.

21           THE COURT:  All right.

22           MR. MINER:  But disregarding Page 2 of the

23   reasoning, of the decision, the arbitrator relies on his

24   implied understanding, his assumption, the assumed rational

25   response to an irrevocable election.  There is no rational

1     interpretation -- to put it another way, the decision isn't

2     based on Article 32 of the current Collective Bargaining

3     Agreement --

4           THE COURT:  Is your position that the -- it may be

5     a distinction without a difference, but is it your position

6     that the award should be overturned because the arbitrator

7     rewrote the contract, or is it your position that the award

8     should be overturned because his interpretation, contractual

9     interpretation, if you will, was so irrational as to be

10     absurd?

11           MR. MINER:  This is a case where the arbitrator

12     has effectively ignored language in the agreement.  And that

13     is --

14           THE COURT:  Of which agreement?

15           MR. MINER:  Of the 2003 bargaining agreement.  The

16     parties' current agreement.  Article 32 provides that

17     eligible employees will receive medical benefits.

18     Arbitrator Creo read the term "eligible" out of the

19     agreement by saying that any employee, even an employee who

20     has specifically, permanently, and irrevocably opted out of

21     medical benefits, still is entitled to medical benefits

22     under Article 32.

23           THE COURT:  Here's a question, then, I have.  Here

24     is another issue.  What is your position on this:  Does a

25     condition in a Collective Bargaining Agreement such as the

1  irrevocability condition which existed as an addendum, I

2  believe, to the original agreement, can a prospective

3  condition -- this is a legal issue -- in a CBA continue

4  CBA's in the absence of an expressed incorporation or

5  written continuation of the original agreement?

6              MR. MINER:  Yes.

7              THE COURT:  As a matter of law, as a matter of

8  labor law?

9              MR. MINER:  As a matter of federal common law of

10  labor, the answer to that question is yes.  In at least

11  three cases, the Supreme Court has provided guidance on that

12  issue and stated, for instance, in the Nolte case that a

13  postexpiration assertion of a contractual right to severance

14  benefits still is a viable claim that at least must be

15  arbitrated.

16              Now, the issue came back up again more

17  recently in the Litton Financial Services Printing Division

18  case.  Both of those cases are very clear that even in the

19  postexpiration context, the duty to continue to arbitrate

20  disputes over legal rights that arise under a collective

21  bargaining agreement continues, presumptively continues

22  after the expiration of that agreement.

23              THE COURT:  Do those cases stand for the

24  proposition that if you have a Collective Bargaining

25  Agreement that prospectively provides and indefinitely

1    provides, if you will, for thus and so, in the absence of a

2    rejection or retraction of that provision in subsequent

3    CBA's, that provision, if you will, is subsumed within them,

4    even though it's not a written part of it?  Is that what

5    your position is?

6              MR. MINER:  As a matter of contract, if the

7    parties provide for irrevocable rights under one Collective

8    Bargaining Agreement, and a subsequent Collective Bargaining

9    Agreement is silent on that same subject, those rights must

10   continue beyond the expiration of the Collective Bargaining

11   Agreement that contained them.

12             And that is particularly appropriate in this

13   case, where we have an addendum that simply provides an

14   opportunity for Kaiser retirees to make a one-time

15   irrevocable election.  The parties discussed the irrevocable

16   nature of the election, agreed that would be irrevocable,

17   and the Kaiser retirees actually signed forms that provide

18   they are irrevocable, permanent.

19             THE COURT:  All right.  With that as background,

20   the arbitrator goes to the Collective Bargaining Agreement,

21   and he looks at it, and he says, this is the operative

22   agreement; in my opinion, this is what controls.  And for

23   the reasons I just said, I don't -- he says, I don't find

24   the provision.

25             Now, even if he's wrong, as a matter of

1    contractual interpretation, and if you're right, is that the

2    kind of mistake I'm entitled to trump?

3            MR. MINER:  If there were some other rational

4    basis in the award and this were simply a supplemental

5    justification for his decision -- in other words, his

6    interpretation of the four corners of the document simply

7    supplement some other conclusion that he has reached that

8    would provide an acceptable alternative basis for the award,

9    then it would not be appropriate to vacate the award.

10           THE COURT:  But in this case, in 95 percent of

11   these cases, as they come on to the District Courts, what's

12   happening is that the arbitrator below hasn't made his

13   decision on the basis of what he perceives to be the absence

14   of something; he's made his decision on the basis of an

15   interpretation of something that's already in the agreement.

16   That's not what he did here.  He concluded that the absence

17   of a provision was controlling.

18           Now, why is that any different than him

19   looking at a contract -- a term of the CBA which may be

20   completely inappropriate and yet he's construing it?  I

21   would be stuck with that, wouldn't I?

22           In other words, I would be stuck with -- if

23   we had a situation where he was being asked to construe what

24   the term agreement means within the four corners of the

25   CBA -- and let's assume he comes down with a position that

1  is -- borders on preposterous, but that's his best shot -- I

2  might be stuck with that type of decision.  Is that right?

3         MR. MINER:  Just because the Court disagrees with

4  the interpretation doesn't mean the interpretation should be

5  vacated.

6         THE COURT:  All right.  Then where on the sliding

7  scale of egregious error -- how do I know when something

8  moves from the garden variety realm of arbitrator mistake of

9  fact or law over which the Third Circuit tells me I have no

10  control to remedy that, what is the litmus test for when

11  something becomes so bad that I'm entitled to unscramble it?

12         MR. MINER:  When the arbitrator's decision

13  conflicts with the results of the parties' negotiations, as

14  it does here.  There may be a lot of gray area in cases

15  where one must decide how serious an error is.  But here,

16  we're dealing with alleged interpretation of irrevocable

17  elections and whether those elections should have continued

18  beyond the expiration of the 1997 agreement.

19         THE COURT:  This doesn't have any bearing at all

20  on the resolution of this issue, but it's really background

21  information for me, because I'm curious about it.

22             If I remember from the file, when Kaiser --

23  when it looked like Kaiser was going to go into bankruptcy

24  and nothing good was going to come of that, at least in

25  terms of the continuance of the retirees' medical coverage,

1  the company on its own approached the Union with an attempt

2  to offer some type of accommodation.  Is that right?

3          MR. MINER:  Absolutely correct.

4          THE COURT:  All right.  And I can only assume that

5  since we're here today, you weren't able to come to any kind

6  of accommodation here.

7              But here's my question:  From an economic

8  impact standpoint, how is this impacting on your client?

9  And how -- well, first answer that question.  What is

10 driving this -- if you were willing to accommodate it at one

11 point, what is driving it from a dollars and cents

12 standpoint today?

13         MR. MINER:  Your Honor, this is not a dollars and

14 cents case.  That's just not what it is about.

15         THE COURT:  All right, what is it?

16         MR. MINER:  This is about the principle -- this is

17 about whether the parties can live with the results of their

18 negotiations.  The company cannot live with an award that

19 says that irrevocable, permanent elections are, in fact,

20 contingent or conditional upon the continuation of benefits

21 by some other party.

22         THE COURT:  Whether it's of any legal moment or

23 not, through resolution of the motion that is in front of

24 me, wouldn't it have been cleaner if there was some

25 reference in the new agreement to what had happened in the

1    old, just as a matter of good lawyering?

2              MR. MINER:  I think that the parties --

3              THE COURT:  In retrospect, what's the harm in

4    doing it?

5              MR. MINER:  In retrospect, there may have been no

6    harm.  Although the collective bargaining process can be

7    very unpredictable, can be very intense and emotional at

8    times.

9              THE COURT:  True.

10             MR. MINER:  But I think it's fair for the parties

11   to rely on the irrevocable effect of irrevocable elections

12   and to assume that when they say in Article 32 that only

13   eligible employees will receive medical benefits, that an

14   arbitrator subsequently will not come along nine months into

15   the Collective Bargaining Agreement and say that some

16   condition, the change of some condition that is out of the

17   Company's control has somehow made employees who have been

18   working in the plant, benefiting from their elections for

19   more than seven years, that somehow those employees became

20   eligible for benefits.

21             THE COURT:  Listening between the lines, if you

22   will, aside from a concern about setting a bad labor

23   precedent, if you will, by voluntarily agreeing to

24   accommodate these retirees -- and do you know how many there

25   are who would be looking for benefits with Accuride?

1          MR. MINER:  I do, Your Honor.  It's not in the

2     record.

3          THE COURT:  Well, just --

4          MR. MINER:  There are currently six active

5     employees working in the plant who opted out of Accuride

6     medical benefits who would be eligible for some benefits

7     under the Creo award.

8          THE COURT:  All right.

9          MR. MINER:  In addition, there are approximately

10    13 to 14 former Erie employees who have been active

11    employees since June 1st of 2004, and so would be eligible

12    for some type -- presumably some type of remedy, again under

13    Arbitrator Creo's  award.

14         THE COURT:  And, finally, once again, if -- and I

15    just say if those -- if those people who had opted out were

16    permitted to jump on the Accuride medical coverage

17    bandwagon, would it cost you a cent?

18         MR. MINER:  Your Honor, I appreciate the line of

19    this question, and I would like the Court to know that I

20    agree in many respects that this case is a case that never

21    should have been arbitrated, it shouldn't be the subject of

22    a Section 301 case today, it should have been settled in May

23    of 2004 based on what the company proposed.  But it wasn't.

24         THE COURT:  Answer my question.  Would it cost you

25    a cent?

1          MR. MINER:  It would cost the amount of the

2     premiums that would have to be paid for these employees to

3     be enrolled in Accuride's plan, so it would.

4          THE COURT:  In the grand scheme of things, just to

5     put the finest point on it we can, whatever that additional

6     cost, given the fact that there's a relatively small group

7     of people that are looking for this, would that, in the

8     grand scheme of things, be infinitesimal?  Would that be

9     fair to say?

10         MR. MINER:  I don't know that that's fair to say.

11    There would be premium costs for these people.  The

12    experience history of these employees who are at issue are

13    bound to be significant.  These are older employees in the

14    work force.  They could increase the experience history for

15    the entire plant --

16         THE COURT:  It might not be in the record, but how

17    big is the plant?  Do you know?

18         MR. MINER:  There are about 125 hourly employees.

19    Since hourly employees all share the costs of medical

20    benefits in the plant, that could mean higher medical costs

21    for everyone in the plant, as well as the company.

22         THE COURT:  Now, you know, I don't know that this

23    is, but it could be; you know, the old saying, hard cases

24    make bad law.  But the people who are attempting to obtain

25    the Accuride coverage, are they coverageless right now?

```
 1              MR. MINER:  Your Honor, there -- we don't know, to

 2    answer your question.  I met with the Union just this last

 3    Tuesday to discuss this very subject, and what I heard from

 4    the Union was that they do not know what the coverage status

 5    is of these six employees.  They do not know what the

 6    out-of-pocket costs might be for the other 13 or 14 --

 7              THE COURT:  Well, even if -- wouldn't they -- I

 8    mean, you had indicated that the company might have to pay

 9    some portion of these premiums.  Don't the individuals have

10    to contribute some portion toward their own premium

11    coverage?

12              MR. MINER:  Yes.  Employees contribute 12 percent

13    currently toward the cost of their coverage under the

14    amended plan.

15              THE COURT:  All right.  Let me hear from your

16    adversary.

17              MR. MINER:  Thank you, Your Honor.

18              MS. TRAFTON:  Good afternoon, Your Honor,

19    Catherine Trafton for the UAW.

20              THE COURT:  Yes.  Isn't there something unfair

21    about this, in this sense:  I went back and read the

22    agreement, the original addendum.  And my goodness gracious,

23    it could not be any clearer to me -- I mean, they almost put

24    a flashing red light on that said, beware, beware, this is

25    irrevocable, this is permanent, and you have one chance to
```

1    change it.

2              Now, clearly, years down the road, as things

3    often happen, the landscape changed.  Aren't you trying to

4    undo something here that was very carefully crafted, simply

5    because contrary to what people may have expected years

6    before, something changed?

7              MS. TRAFTON:  No, Your Honor, I don't think it's

8    unfair and I don't think we're trying to change something

9    under those circumstances.  And I'm going to stick with what

10   the arbitrator -- what his rationale is here, because that's

11   what the law --

12             THE COURT:  Let's do that then.  Here is my

13   question to you:  Here is my question to you:  Let's assume

14   for the sake of discussion -- let's assume for the sake of

15   discussion that the addendum which existed in the earlier

16   agreement was placed in the latter agreement, all right, and

17   let's also assume that the Union went forward anyways,

18   challenging it, in part because of the change in

19   circumstance, that Kaiser is bankrupt and they no longer

20   have this second source -- are you with me so far?

21             MS. TRAFTON:  Yes.

22             THE COURT:  And let's assume that the -- that

23   the -- I can't remember what this arbitrator's name was.

24             MS. TRAFTON:  Creo.

25             THE COURT:  Let's assume that Arbitrator Creo, his

1    decision was in your favor, and this is how it went:  It was

2    the second half of the decision he actually wrote.  Rather

3    than saying it's not included under the Collective

4    Bargaining Agreement -- because under our hypothesis now,

5    the underlying assumption is that the employees have some

6    comparable benefits from a collateral source.  It is against

7    common sense to refuse benefits to these employees, now that

8    they are no longer receiving benefits from a third party.

9    That is his sole basis, his sole basis for finding in your

10   favor.  You'll recall in our situation, it was an

11   independent basis, if you will, for finding in your favor.

12              My question to you is, does that reason draw

13   its essence from the Collective Bargaining Agreement?

14              MS. TRAFTON:  Yes, Your Honor, it does.  And the

15   reason that that decision draws its essence from the

16   Collective Bargaining Agreement is that the arbitrator, as I

17   read his decision, he looked at that contract, and he said

18   basic contract interpretation principle is that agreements

19   have to be read to fulfill the intent of the parties.

20              And I think to go back to what you said at

21   the beginning about whether this is fair or not, I think

22   this is important --

23              THE COURT:  I'm not so sure fair -- I might have

24   injected the wrong concept into it.  I'm not so sure

25   fairness has anything to do with it.  I think what a clear

1    contract says may have everything to do with it.

2           MS. TRAFTON:  Okay.  So if we take a look at what

3    the language of the waivers, let's call them, said, those

4    waivers make no reference to the termination of coverage

5    altogether.  The arbitrator took a look at those agreements,

6    he said, what were these parties trying to get at when they

7    reached this.

8           This wasn't about -- and I think this is a

9    really important point.  This wasn't about asking these

10   employees to take a gamble on whether this very important

11   benefit would be provided to them in the future when the

12   Union went to the company and said we'd like people who have

13   the choice to be able to take that choice; either they stay

14   with Kaiser or go with AKW.  Our original proposal was that

15   people be allowed to go back and forth.  The company said to

16   us, look, administratively, doing it once is difficult

17   enough for us; we're not going to be able to allow people

18   every time the benefit goes up over here to switch back and

19   forth.  And the language of that agreement, you know, refers

20   to benefits becoming higher or lower.  It doesn't say

21   benefits terminating.

22          And so what the arbitrator did is he said

23   that's not what this agreement was about.  This agreement

24   was about making sure that this was doable

25   administratively --

1          THE COURT:  Isn't the arbitrator at least in that

2    respect doing precisely what Court after Court after Court

3    in the very few times where they actually get in and change

4    things, doing precisely what they say they shouldn't do?  I

5    mean, an arbitrator, if you have clear language in any

6    prospective contract, no one can anticipate all of the

7    vagaries and changes of life.  One can presume if they had

8    wanted to put something in there, they conversely could have

9    done it.

10          I have never seen language that is more clear

11   than permanent, irrevocable, one time; in essence, proceed

12   at your own caution.  To say that an arbitrator can do

13   that -- and this is more of a rhetorical question, I want

14   you to answer it -- doesn't that inject such a healthy dose

15   of uncertainty in the labor contract relations that it would

16   turn the CBA world on its head; no one could rely on

17   anything?

18          MS. TRAFTON:  Well, if I could, Your Honor, first

19   of all, we have -- I mean, we sort of jumped very quickly to

20   the sort of hypothetical, if this was the only basis upon

21   which the arbitrator had made his decision --

22          THE COURT:  Do you agree with me -- and I'm not

23   going to ask you to fall on your own sword on that point,

24   because I'm just not going to do it.  But is it fair to say

25   that you are putting most of your -- most of your eggs in

1  the arbitrator's basket, where he said, I'm reaching this

2  decision on the basis that I do not find the provision in

3  the new Collective Bargaining Agreement?

4          MS. TRAFTON:  Yes, Your Honor, I think --

5          THE COURT:  Is that a stronger position for you,

6  in all candor?

7          MS. TRAFTON:  In all candor, it is.  I think

8  that's the way for the Court to interpret the arbitrator's

9  interpretation.  Did he interpret the contract before him.

10 He interpreted the contract based on his read of it, which

11 he said does not include this provision.

12         THE COURT:  Let me ask you this, and tell me if

13 this makes sense to you or doesn't:  Parties in Collective

14 Bargaining Agreement in year one say henceforth and forever

15 it will be unnecessary, it will be unnecessary for workers

16 who work on the floor to wear protective glasses.  It has

17 nothing to do with this, but the principle is the same.  You

18 have a provision that says henceforth and indefinitely, no

19 one needs to wear protective glasses.  A new Collective

20 Bargaining Agreement comes along and during the period of

21 the second Collective Bargaining Agreement -- and by the

22 way, everybody signed off on that, the Union and management,

23 under the first Collective Bargaining Agreement.

24              A Union member is working on the floor, and a

25 supervisor comes up and says to him you're fined a hundred

1   dollars because you don't have your glasses on.  Says, what

2   do you mean; three years ago we signed something that said

3   in -- forever and ever and ever this is eliminated from the

4   plan.  Would the -- but it wasn't -- but there was no

5   specific reference to it in the new Collective Bargaining

6   Agreement.  Who has got the better end of that argument at

7   the arbitration?  The foreman or the Union member?

8               MS. TRAFTON:  The argument would be a question of

9   contract interpretation.  And it seems to me that Collective

10  Bargaining Agreements are based on a term -- they always

11  have a term.  And they change.  Each time -- well, sometimes

12  they don't.  Sometimes you carry the same exact --

13              THE COURT:  Does it make any sense, if there's

14  language in a Collective Bargaining Agreement that says

15  forever, that -- does it make sense to interpret forever or

16  indefinite, if you will, or permanent, as coextensive only

17  with the term of that Collective Bargaining Agreement?

18  Because I can tell you that three or four years is not

19  forever, and three or four years is not permanent.

20              MS. TRAFTON:  I think that it can.  An irrevocable

21  agreement could be read to be confined to the terms of the

22  agreement.  And I think it's reasonable as a matter of

23  contract interpretation to take a look at what the parties

24  intended in a situation and interpret that contract to

25  interpret whether or not something is carried forward or

1    not.  It seems to me that it would be a case-by-case --

2          THE COURT:  Does this common law principle of

3    contract construction circumscribe to some extent the

4    discretion of an arbitrator?  Is an arbitrator, in

5    construing a contract for a CBA, bound by the same contract

6    principle that I am?  And that is where the terms of a

7    contract were clear, the reviewing Court is obliged to

8    enforce them as written, and it's inappropriate to look for

9    parole evidence for the intent of the parties?  Is the

10   arbitrator bound by that same -- almost Hornbook principle

11   of contract construction?

12         MS. TRAFTON:  I don't think that an arbitrator is

13   bound in the same way that a Court is, but I do think that

14   absolutely arbitrators look to, you know, the -- the -- you

15   know, the same Hornbook law that the Court would look to in

16   terms of --

17         THE COURT:  What is then ambiguous about the

18   language that was used in conjunction with those employees

19   who made a one-time irrevocable and also permanent decision

20   to opt for Kaiser benefits, as opposed to Accuride?  Where

21   is the ambiguity in that language?

22         MS. TRAFTON:  I'm not sure I would say it's

23   ambiguity, but I would say what is missing from that

24   language is -- I think that what the arbitrator did is look

25   at the facts, and when the parties negotiated this

1    agreement --

2            THE COURT:  Did he then submit -- did he then

3    submit terms or conditions that the parties themselves did

4    not include, but could have, if they chose to do so as part

5    of their bargaining process?

6            MS. TRAFTON:  I don't -- I don't think he

7    inserted -- I don't think he inserted into --

8            THE COURT:  Well, it wasn't there before, was it?

9    Is there anything in there that says if there is a material

10   change of circumstance some day or if benefits only become

11   available from Accuride, the terms and conditions of this

12   agreement insofar as it relates to the addendum are null and

13   void?  Is there anything --

14           MS. TRAFTON:  I'm sorry; I may have misunderstood

15   your question.  The agreement does not contain that

16   language.

17           THE COURT:  So to that extent, he did insert it

18   figuratively, didn't he?

19           MS. TRAFTON:  He read the agreement with the

20   parties' intent in mind, and he determined that that

21   agreement was not meant to ask employees to gamble about

22   whether they would have future coverage or not.  That it was

23   meant to fulfill a particular purpose, and that purpose had

24   to do with what would happen if employees continually came

25   in and out of coverage.

1          THE COURT:  It would be fair to say that he

2     implied, based upon his common-sense understanding, he

3     implied a condition precedent to the ongoing vitality of

4     that addendum which the parties themselves, for whatever

5     reason, decided not to include; is that correct?

6          MS. TRAFTON:  I'm not sure I would use the phrase

7     that he implied a condition precedent.

8          THE COURT:  Well, why not?  Let's think about it.

9     In his view, as I understand it -- and correct me if I'm

10    wrong -- in his view, the collapse of Kaiser -- let me put

11    it this way:  The continuation of Kaiser and, therefore, its

12    medical coverage program was a condition precedent to the

13    continued vitality of that agreement.  Is that a fair way to

14    put it?

15         MS. TRAFTON:  I would agree.  I think that what

16    the arbitrator decided was that because Kaiser went bankrupt

17    and that terminated coverage for these individuals, that

18    that agreement failed its purpose, because the purpose --

19         THE COURT:  All right.  Fundamentally.

20         MS. TRAFTON:  Yes, I would agree with that.

21         THE COURT:  Now, what does this all mean to your

22    people as a practical matter?  In asking the question.  I'm

23    not suggesting for a minute that the appropriate resolution

24    of this turns on that, but sometimes it's useful just to get

25    a feel as to why a case gets as far as it has.

1          MS. TRAFTON:  Well, what it means to our -- it's
2    quite practical, what it means to our individuals.  And I
3    can't -- you know, we had gathered information early on in
4    the process about what people had been paying out for
5    coverage, but that, you know, information is not up to date,
6    so I can't tell you dollar figures what it matters to
7    individual employees.  But as a result of not being covered
8    by Kaiser or Accuride, those individuals have had to seek
9    coverage on their own.  And for some people that has meant
10   literally paying flat out, out-of-pocket expenses, and for
11   some people that's meant having some alternative coverage
12   through a spouse or some forth.
13          I can't give you specific care people haven't
14   been able to get, but it has left people who had full health
15   coverage without it and to find their own way to get it.
16          THE COURT:  So insofar as the Union is
17   concerned -- I'm not putting words in the Plaintiff's
18   mouth -- are you fighting over principle too or are you
19   fighting something over more than that?
20          MS. TRAFTON:  We have two folds.  We're here for
21   two reasons.  Certainly we do fight when we feel our
22   agreements have not been lived up to and the company says it
23   can't live with this arbitrator's decision, but we would say
24   we reached an agreement.  We agreed to be bound by what this
25   arbitrator said, so there is a principle here which

1    certainly is when a company refuses to comply with an

2    arbitration award, we will seek to enforce it.

3              But quite frankly, practically speaking, we

4    are here because there are people who don't have the health

5    insurance coverage that they need, and we are seeking to get

6    that.  And, you know, the company's proposals to settle the

7    case -- well, they are not going to settle the case.  What

8    the company offered early on isn't sufficient.

9              THE COURT:  This isn't part of the record, but if

10   you know, was there some perceived economic advantage or

11   service advantage or some type of advantage to those people

12   who decided to remain with Kaiser and not take the new

13   coverage when it became available?  Do you know?

14             MS. TRAFTON:  I don't know, Your Honor.  I don't

15   know the specifics of what those benefits --

16             THE COURT:  That's outside your institutional

17   memory of this case.

18             MS. TRAFTON:  Indeed.

19             THE COURT:  Is that right?

20             MS. TRAFTON:  Yes.

21             THE COURT:  All right, thank you.  Is there

22   anything else you want to say to me?  Because I want to have

23   a chat with both you folks in my chambers when we're done

24   here.  Anything you want to say to me on the merits?

25             MR. MEREDITH:  Your Honor, we have not had an

1  opportunity to address the subject of the timeliness of

2  grievance.

3            THE COURT:  Well, you can talk to me about that,

4  but -- and while I have no fixed opinion on it, it sure

5  looks to me that that likely draws its essence from the

6  Collective Bargaining Agreement, whether he's right or

7  wrong, but that isn't my primary focus here, to be quite

8  honest with you.

9            MR. MINER:  Thank you, Your Honor.

10           (Discussion held off the record.)

11

12           (Hearing concluded at 3:09 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25